IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| GEORGE FINLINSON,<br><br>Plaintiff,<br><br>vs.<br><br>MILLARD COUNTY, a Utah governmental agency; ROBERT DEKKER, individually and in his official capacity as Millard County Sheriff; MORRIS BURTON, individually and in his official capacity as Millard County Sheriff's Deputy; STEVE MITCHELL, individually and in his official capacity as Millard County Sheriff's Deputy; MICHAEL BLAD, individually and in his official capacity as Millard County Sheriff's Deputy; ROBERT CLARK, individually and in his official capacity as Millard County Sheriff's Deputy; CLARK THOMAS, individually and in his official capacity as Millard County Sheriff's Deputy; UTAH ADULT PROBATION AND PAROLE, a Utah governmental agency; IAN ADAMS, individually and in his official capacity as an officer of Utah Adult Probation and Parole; UTAH COUNTY, a Utah governmental entity; and JIM TRACY, in his official capacity as Utah County Sheriff,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:16-cv-01009-TC |

This civil rights case began in 2014 when Plaintiff George Finlinson's family attempted to civilly commit him so he could get treatment for his paranoid schizophrenia. But what began as a seemingly simple task for county law enforcement—to take Mr. Finlinson into custody— quickly devolved into a thirty-minute slow-speed chase involving multiple officers and looking at times like a game of chicken, with Mr. Finlinson ramming his truck into some of the police cars. The chase ended in the shooting and tasing of Mr. Finlinson, who was later treated at a hospital and arrested upon release.

But the problems did not end there. As a detainee at the Utah County Jail, Mr. Finlinson was placed on suicide watch for six weeks and then spent an additional six and a half months in solitary confinement. He was eventually released to the Utah State Hospital (which treats patients with mental illnesses) where he regained competency to stand trial for the charges brought against him.

Now he asserts multiple civil rights claims against the entities and individuals involved in the chain of events under 42 U.S.C. § 1983. Against the Millard County Defendants and Defendant Ian Adams, a Utah Adult Probation and Parole officer—all of whom were involved, in some capacity, with the chase, shooting, and tasing—he brings § 1983 claims under the Fourth and Fourteenth Amendments. Against Defendant Utah County he brings a § 1983 municipal liability claim under the Fourteenth Amendment and a state constitutional claim, both based on his treatment at the jail.

All of the Defendants have filed motions for summary judgment, including assertions of qualified immunity by the individual officers. They challenge Mr. Finlinson's claims of liability for the shooting and tasing, failure to intervene, supervisory liability, implementation of a

reckless plan to civilly commit him, failure to train, and municipal liability. For the reasons set forth below, all of the motions are denied at least in part.

## FACTUAL BACKGROUND

### Plan to Civilly Commit George Finlinson

In the summer of 2014, Mr. Finlinson, who suffers from paranoid schizophrenia, became increasingly withdrawn and eventually stopped talking to anyone but his father. His family sought to have him civilly committed, a procedure known as "blue slipping," and contacted the Central Utah Counseling Center for help.

On July 29, 2014, Anna LaDamus, the Director of Crisis Services at the Center, called Defendant Morris Burton, a lieutenant with the Millard County Sheriff's Office, to request that he pick up Mr. Finlinson and take him to the hospital. Ms. LaDamus told Lieutenant Burton that Mr. Finlinson needed to be civilly committed because he was becoming violent and his family was afraid of him. Although Mr. Finlinson disputes that he acted violently or that his family was actually in fear, all parties agree that, at the time, he presented a substantial danger to himself or others, a requirement for involuntary commitment under Utah law. See Utah Code Ann. § 62A-15-629.

Lieutenant Burton enlisted five other officers to help him commit Mr. Finlinson—Deputy Clark Thomas, Sargent Robert Clark, Deputy Michael Blad, Deputy Steve Mitchell (who was still in training), and Utah Adult Probation and Patrol Agent Ian Adams.[1]

---

[1] All of the officers are defendants except for Sargent Clark. The court dismissed the claims against Sargent Clark based on the parties' stipulation. (See Oct. 20, 2017 Order, ECF No. 69.)

Lieutenant Burton took Ms. LaDamus' call while attending a retirement party for another police officer in the city of Fillmore, Utah. Also at the party was Millard County Sheriff Robert Dekker, Lieutenant Burton's supervisor. Lieutenant Burton told Sheriff Dekker that he would be blue slipping Mr. Finlinson, though the full extent of their conversation is not clear from the record. He did not, at this time, tell Sheriff Dekker exactly how he planned to apprehend Mr. Finlinson.

Lieutenant Burton left Fillmore and drove to Oak City, where Mr. Finlinson lived. While driving to Oak City, Lieutenant Burton called Mr. Finlinson's sister, Jean, and father, Vance. From these calls, Lieutenant Burton learned that Mr. Finlinson was not taking his medication, kept guns in his house, and probably would not answer the door if officers knocked. Vance told Lieutenant Burton that the best time to try to take Mr. Finlinson into custody would be when he left the house for his regular evening drive.

After speaking with Jean and Vance, Lieutenant Burton decided that he would let Mr. Finlinson begin his drive, then pull him over using the pretext of a traffic stop for driving on a suspended license (Ms. LaDamus recommended a similar course of action on their earlier phone call). Agent Adams would wait near Mr. Finlinson's house in his unmarked black police car and alert the other officers when Mr. Finlinson left his house and began his drive. Lieutenant Burton expected Mr. Finlinson to drive to the nearby city of Delta, then west to more remote roads. Once outside of Delta, marked Sheriff's Office trucks would pull Mr. Finlinson over, and Lieutenant Burton planned to box Mr. Finlinson in with his car once Mr. Finlinson stopped.

Lieutenant Burton and the other officers anticipated that Mr. Finlinson would resist being taken into custody. They knew that he was a large, strong man, and also knew he had resisted

arrest a few months earlier, during a March 13, 2014 traffic stop. During that earlier stop, Mr. Finlinson became belligerent after being handcuffed, and a Millard County Sheriff's deputy and two highway patrol officers used an electric taser to subdue him.

The officers planning to blue slip Mr. Finlinson thought he would again resist. Despite this, Lieutenant Burton did not formulate a backup plan. He did not have a strategy to follow in case Mr. Finlinson refused to pull over. And though he knew that Mr. Finlinson was suffering from paranoid schizophrenia, he did not consider Mr. Finlinson's mental illness when deciding the actions to be taken.

While the officers waited for Mr. Finlinson to begin his drive, Sheriff Dekker called Lieutenant Burton. Sheriff Dekker later testified that he had encouraged Lieutenant Burton to intercept Mr. Finlinson before he got into his truck.

**Northbound Chase on Anderson Lane**

Lieutenant Burton stuck with his plan. Mr. Finlinson left his house, got into his pickup truck, and—trailed by police vehicles—drove a short distance through Oak City. He then turned north on Anderson Lane, a rural gravel road that dead-ends after approximately three miles at a turnaround loop (at this point he was driving away from Delta, not towards it as Lieutenant Burton had expected).

The caravan of police vehicles initially consisted of four vehicles: Agent Adams' unmarked police car, Lieutenant Burton's unmarked white sport-utility vehicle, Sargent Clark's marked Sheriff's Office pickup truck, and Deputy Blad's marked pickup truck. Deputy Mitchell

rode as a passenger with Deputy Blad.  Deputy Thomas soon joined the pursuit in his marked pickup truck.[2]

The officers tried to pull Mr. Finlinson over soon after he began driving.  Deputy Blad, Sargent Clark, and Agent Adams all activated their emergency lights.  Deputy Blad also briefly used his siren.  But Mr. Finlinson refused to pull over, and, instead, continued driving north on Anderson Lane at about five to ten miles per hour.

After Mr. Finlinson failed to pull over, Deputy Thomas drove his truck directly behind Mr. Finlinson and commanded him to pull over eight separate times using his loudspeakers.  He also tried twice to pass Mr. Finlinson.  Both times, Mr. Finlinson swerved to block his way.  For approximately fifteen minutes, Deputy Thomas and the other officers slowly trailed Mr. Finlinson down Anderson Lane.

When Mr. Finlinson reached the short loop at the end of the road, he began to drive around it in a clockwise direction.  Sargent Clark and Deputy Blad positioned their trucks in his path, but Mr. Finlinson weaved slowly through a gap between the two trucks.  His truck grazed Deputy Blad's truck as he passed.

### Southbound Chase on Anderson Lane

Now travelling south on Anderson Lane, the officers intensified their efforts to stop Mr. Finlinson.  Deputy Thomas and Deputy Blad drove past Mr. Finlinson, pulled their trucks abreast

---

[2] Most of the chase—up to the point when Mr. Finlinson was shot and tased—was captured on Deputy Thomas', Sargent Clark's and Deputy Blad's dash cameras.  Though the court must, for the purpose of summary judgment, construe the facts in a light most favorable to Mr. Finlinson, "that is not true to the extent that there is clear contrary video evidence of the incident at issue." Thomas v. Durastanti, 607 F.3d 655, 659 (10th Cir. 2010).  Accordingly, the court "rel[ies] upon facts established by a video capturing much of the event together with . . . the remaining facts." Id.

of one another, and braked, again trying to block Mr. Finlinson's way. Rather than stop, Mr. Finlinson drove through the narrow gap between the officers' two trucks, hitting both vehicles and physically forcing them apart. The impact disabled Deputy Thomas' truck.

Mr. Finlinson continued driving south. Deputy Blad again tried to pass Mr. Finlinson on the left, driving onto a dirt-and-grass strip between the road and a fence line. As Deputy Blad passed, Mr. Finlinson swerved into the side of his truck. The collision shattered Deputy Blad's rear window. Deputy Blad made it past Mr. Finlinson but quickly abandoned his effort and let Mr. Finlinson pass.

Next, Sargent Clark tried to pass Mr. Finlinson off-road on the left, just as Deputy Blad had done. Mr. Finlinson again swerved and hit Sargent Clark's truck, causing it to veer sideways and skid across the roadway. Sargent Clark was able to straighten his truck, then sped past Mr. Finlinson to set up spike strips farther down the road (he drove back into Oak City to set up the strips, and the chase would never reach him).

Moments later, the chase passed Sheriff Dekker, who was driving in the opposite direction on Anderson Lane in an unmarked black sport-utility vehicle. Sheriff Dekker allowed the vehicles to pass, then joined the chase. Four vehicles now trailed Mr. Finlinson: Deputy Blad's pickup truck (in which Deputy Mitchell was a passenger), followed by Lieutenant Burton's sport utility vehicle, then Agent Adams's car (in which Deputy Thomas rode as a passenger after his truck was disabled), and finally Sheriff Dekker.

The chase again slowed. Deputy Blad asked over the radio whether he should "hang back," and Lieutenant Burton responded that he should, to allow Sargent Clark to set up the

spike strips.  (Blad Outside Dash Cam. at 23:20–23:30, Ex. J to Millard Cnty.'s Mot. Summ. J., ECF No. 106-10.)

The chase continued at a slow speed for just under a minute.  Then Mr. Finlinson came to a stop and reversed towards Deputy Blad.  Deputy Blad tried to move his truck off the road, but Mr. Finlinson hit its passenger side.  The impact shattered the passenger window and smashed the passenger door, preventing Deputy Mitchell from opening it.  Deputy Blad got out of his truck, pointed his handgun towards Mr. Finlinson, and yelled at him to "get out of the truck." (Id. at 24:10–24:30.)

Mr. Finlinson accelerated forward and continued down Anderson Lane.  Deputy Blad got back in his truck and resumed his place at the front of the chase.  But just seconds later, Mr. Finlinson stopped his truck.  Deputy Blad and the other officers also stopped their vehicles behind Mr. Finlinson.

Mr. Finlinson remained stopped for nearly a minute.  During this time, Deputy Blad asked Lieutenant Burton over the radio, "What do you want me do?"  (Id. at 24:50.)  He also answered a call on his cell phone from another officer who was not on scene, asking whether Deputy Blad needed assistance.  Deputy Blad told him that he did, and that he had "just about shot" Mr. Finlinson.  (Blad Inside Dash Cam. at 25:00–25:19, Ex. K to Millard Cnty.'s Mot. Summ. J., ECF No. 106-11.)  Lieutenant Burton later testified in a deposition that, at this time, he and his officers "did not have a specific plan" for taking Mr. Finlinson into custody.  (Dep. of Morris Burton at 170:19–20, Ex. A to Millard Cnty.'s Mot. Summ. J., ECF No. 106-1.)

Mr. Finlinson then began to slowly reverse towards Deputy Blad.  He paused, then reversed again.  Deputy Blad reversed at the same pace, keeping about the same distance away

from Mr. Finlinson.  Deputy Blad again asked Lieutenant Burton, "What do you want me to do?" (Blad Outside Dash Cam. at 26:02.)  Lieutenant Burton told him to try to "stay out of his way." (Id. at 26:07–26:14.)

**Shooting of Mr. Finlinson**

As Mr. Finlinson neared, Deputy Blad stopped, got out of his truck, and drew and aimed his handgun at Mr. Finlinson.  Mr. Finlinson stopped his truck and drove a short distance forward.  Deputy Blad walked up the shoulder of the road still aiming his handgun and yelled "Come on," at which point Mr. Finlinson stopped and reversed again, turning the back of his truck towards Deputy Blad.  (Id. at 26:27–26:32.)  Deputy Blad fired about seven shots at the rear tires of Mr. Finlinson's truck.  While Deputy Blad was shooting, Mr. Finlinson stopped, shifted into drive, and accelerated forward.

As Mr. Finlinson began to drive away from Deputy Blad, Deputy Thomas fired three shots with his AR-15 rifle at the cab of Mr. Finlinson's truck.

The officers resumed their chase and trailed Mr. Finlinson, again at slow speed.  Sargent Clark radioed the other officers to let them know that the spike strips were in place.  Lieutenant Burton radioed that Mr. Finlinson was intentionally trying to hit the officers and to stay out of his way.  Deputy Blad reported that he had shot out the back tires of Mr. Finlinson's truck.

About two minutes later, Mr. Finlinson once again stopped his truck in the middle of the road and began to quickly reverse.  Deputy Blad stopped and again got out of his truck, thinking that Mr. Finlinson would ram it and set off its airbag.

But Mr. Finlinson veered towards Deputy Blad.  Deputy Blad fired four shots as Mr. Finlinson drove towards him, then took cover behind his truck to avoid being hit.

Mr. Finlinson, still reversing, accelerated past the driver's side of Deputy Blad's truck.  Deputy Thomas and Agent Adams opened fire.

The officers' dash camera footage does not show the shooting.  The only video of the shooting was taken by witnesses who were watching the event from a distance, and the footage is shaky.  (See Witness Video, Ex. R to Pl.'s Mem. Opp'n to Millard Cnty.'s Mot. Summ. J., ECF No. 122-18.)  But the video does show Mr. Finlinson first reversing past Deputy Blad's truck, then reversing past Lieutenant Burton's vehicle (while not clear from the video, the parties agree that Mr. Finlinson's truck clipped the front corner of Lieutenant Burton's vehicle).  The video shows Deputy Thomas standing by the road's fence line, firing his rifle.  It also shows Agent Adams getting out of his car and firing his handgun.  Mr. Finlinson testified that when he heard gun shots, he "laid down on the floor boards, and pushed the gas as [he] did so."  (Dep. of George Finlinson at 106:10–:14, Ex. A to Pl.'s Mem. Opp'n to Millard Cnty.'s Mot. Summ. J., ECF No. 122-1.)

As Mr. Finlinson's truck passed Lieutenant Burton's vehicle, it veered into a concrete irrigation ditch along the side of the road and high-centered.  The witness video shows Mr. Finlinson's truck coming to a stop with its driver's side angled up and its passenger side angled down.  Deputy Thomas, Deputy Blad, and Agent Adams all fired shots as Mr. Finlinson

reversed, but the parties dispute whether Deputy Thomas and Agent Adams continued shooting after the truck high-centered. In the witness video, shots are audible for approximately seven seconds after the truck appears to high-center. But because of the distance between the witnesses and the officers, the sound of the shots may lag behind the images.

The officers fired forty shots in total. Mr. Finlinson was hit five times in the torso and once in the neck. He testified that he was only shot after his truck became stuck in the ditch.

### Tasing of Mr. Finlinson

After Mr. Finlinson had been shot and his truck was high-centered in the ditch, officers went to the driver's side of the truck, where they found him sitting passively in the driver's seat. He "was just sitting in his truck, he rolled his window up and was just sitting there[.]" (Excerpt from Tr. of Blad Interview, Ex. Z to Pl.'s Mem. Opp'n to Millard Cnty.'s Mot. Summ. J., ECF No. 122-26.)

Mr. Finlinson was bleeding from his gunshot wounds. He ignored the officers' questions about how badly he was hurt and whether he had weapons. He ignored their requests and commands to get out of the truck. But he did not try to escape and he was not threatening the officers.

After the officers did not receive a response from Mr. Finlinson, Deputy Blad broke the driver's side window with his flashlight. Lieutenant Burton reached in and turned off the engine. They opened the door but, again, Mr. Finlinson just sat in his seat.

Sheriff Dekker told the officers to take Mr. Finlinson out of the truck, so the officers grabbed him and began pulling him out. At that point, Mr. Finlinson swung at Lieutenant Burton and punched him in the head. (According to Officer Blad, Mr. Finlinson swung at him as well.)

Deputy Blad then tased Mr. Finlinson.[3]  Deputy Thomas "stepped in, and then it's, like he's, dog piled, there's like 3 of them on him. So I stepped back[.]" (Excerpt from Tr. of Thomas Interview, Ex. W to Pl.'s Mem. Opp'n to Millard Cnty.'s Mot. Summ. J., ECF No. 122-23.)

Sounds of the struggle, the tasing, the officers' shouts, and Mr. Finlinson's cries can be heard on the audio recording retrieved from Deputy Blad's outside dash cam (there is no visual recording of the tasing).  (Blad Outside Dash Cam. at 33:05–33:10.)

Officers surrounding Mr. Finlinson continued to yell commands, including "gimme your goddamn hands," at which time Deputy Blad tased Mr. Finlinson again—this time for a full five-second cycle.  The crackling sound of the taser and Mr. Finlinson's screams can be heard on the recording.  (Id. at 33:12–33:25.)

The officers told Mr. Finlinson to hold still, all while Mr. Finlinson continued to moan. (Id. at 33:20–33:25.)  Six seconds later, Deputy Blad tased Mr. Finlinson a third time, again for a five-second cycle while Mr. Finlinson screamed "no, no, no, no" over the crackling sound of the taser.  (Id. at 33:25–33:31.)  After that, one of the officers told him to "relax."  (Id. at 33:32–33:36.)  At some point Mr. Finlinson was handcuffed (neither the audio recording nor other limited evidence in the record reveal whether that occurred before the second and third tasing or before Mr. Finlinson was told to relax).  In all, the struggle lasted a little over a minute.

During the incident the officers did not tell Mr. Finlinson why they had tried to pull him over, nor did they tell him he was under arrest before they pulled him from the truck.

---

[3] Officer Blad testified that the first taser shot did not work completely.  (See Excerpt from Tr. of Blad Interview.)

Mr. Finlinson was admitted to the Utah Valley Regional Hospital for treatment of his gunshot wounds.

**Booking into the Utah County Jail**

Before Mr. Finlinson was released from the hospital on August 8, 2014, the hospital treating physician prescribed a shot of the anti-psychotic drug Haldol every four weeks. The hospital gave him a shot on August 5, 2014. (Aug 8, 2014 Utah Valley Hospital Discharge Orders, Ex. G to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 131-2.) Accordingly, doses were due September 2, September 30, October 28, November 25, and every four weeks after that.

The day he was released from the hospital, Mr. Finlinson was arrested and taken to the Utah County Jail (the Jail), where he was charged with two counts of attempted aggravated murder of police officers, ten counts of aggravated assault against police officers, assault by a prisoner, failure to stop or respond to command of police, and interference with arresting officer.[4] (Apr. 14, 2015 Mins. of Review of Competency Hr'g at 2, Ex. P to Pl.'s Mem. Opp'n Utah Cnty.'s Mot. Summ. J., ECF No. 125-16.) He was detained pending trial,[5] during which time he was waiting for a court decision that he was competent to stand trial.

Before he arrived at the Jail, Utah County Jail Commander Darin Durfey called Lieutenant Nancy Killian (who oversaw housing and prisoner classification determinations, including segregation of pretrial detainees) to relay the list of charges against Mr. Finlinson.

---

[4] Ultimately, once medicated and found competent, Mr. Finlinson pled guilty to reduced charges.
[5] Because Millard County had a conflict of interest, the Utah County Jail held Mr. Finlinson as a courtesy.

**Administrative Segregation**

Immediately upon Mr. Finlinson's arrival at the Jail, Lieutenant Killian classified him as high risk and placed him in administrative segregation.

The Jail's Administrative Segregation Policy defines "Administrative Segregation" as "a non-punitive inmate management tool used to <u>neutralize a specific, documented, risk</u>. It can be indefinite in duration. However, <u>once the need for the restriction is resolved, the inmate should be returned to a general population housing area</u>." (Utah Cnty. Jail Policy 321.00, titled "Administrative Segregation," at 2 (emphasis added), Ex. O to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-15.) The section titled "Justification for Restrictions" reads:

> <u>Temporary restriction of privileges and/or services</u> may be imposed when necessary to gain immediate control over an inmate's <u>dangerous, threatening, or otherwise unacceptable behavior</u>. Restrictions are also justified to control any situation which <u>threatens the safety, security, control, or order</u> of the jail. <u>The justification for imposing a particular non-punitive restriction shall always be documented in the inmate file</u>.

(<u>Id.</u> § 321.02 (emphasis added).) An initial decision to segregate a detainee must be "reviewed as soon as possible by a supervisor to determine whether the restrictions should be continued." (<u>Id.</u> § 321.03.) Lieutenant Killian was the supervisor who made the final classification decision.

On August 12, 2014, Lieutenant Killian affirmed Mr. Finlinson's designation, citing his charges (the majority of which were allegations of violence against police officers) as the reason. The Incident Report said:

> Move to [sic] <u>due to current violent charges</u> . [sic] this [sic] is his first time in jail so his behavior will need to be watched for a while. <u>After an initial period of observation, if he shows good behavior, he may be considered for a more privileged housing unit</u>.

(Aug. 12, 2014 Incident Report (emphasis added), Ex. D to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 131-1.)[6] A second incident report identified the reason for his segregation: "Inmate FINLINSON will be placed on High Risk status <u>due to his charges and per Lt. Killian</u>." (Aug. 13, 2014 Incident Report (emphasis added).) During Lieutenant Killian's deposition, she agreed that "the fact that [Mr. Finlinson's] altercation happened with other law enforcement officers factored into [her] decision to place him on high risk status." (Dep. of Nancy Killian at 23:15–23:18, Ex. N to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-14.)

In fact, according to Lieutenant Killian, detainees are almost always placed in administrative segregation if their charges include aggravated violence against a police officer. (Killian Dep. at 24:11–25:8.) In contrast, when she was asked whether a detainee's alleged aggravated violence against a civilian would require administrative segregation, she equivocated: "It would depend on the situation. Most likely if they were charged with attempted aggravated murder, yes, but the situation is looked at about what happened with the case . . . ." (<u>Id.</u> at 23:1– 23:4.)

**<u>Suicide Watch</u>**

In addition to Mr. Finlinson's high-risk classification and his assignment to administrative segregation, the intake deputy placed him on suicide watch "due to his wounds and refusal to answer questions" during the intake interview. (Aug. 8, 2014 Chart Note, Ex. 1 to Decl. of Dale Bench, ECF No. 110;[7] <u>see also</u> UCSO Intake Questions, Ex. 1 to Bench Decl.)

---

[6] All incident reports are contained in Exhibit D to Mr. Finlinson's opposition to Utah County's Motion for Summary Judgment at ECF No. 131-1.
[7] All chart notes are contained in Exhibit 1 to Mr. Bench's declaration at ECF No. 110.

The deputy, who noted that Mr. Finlinson was "involved in officer involved shooting," described Mr. Finlinson as "cooperative" with the exception that he refused to answer questions including "Are you suicidal?" (UCSO Intake Questions, Ex. 1 to Bench Decl.) Yet, at the same time, on the same intake form, the deputy answered the question "Is the inmate thinking about killing him/herself" with the response "No" and added that Mr. Finlinson "stated that he was not suicidal when placed in a suicide prevention gown." (Id.) Ultimately, he was on suicide watch for six weeks.

Suicide watch is a highly restricted status in which a detainee may not wear regular clothes but instead must wear a "suicide smock" (a dress-like garment made of heavy, quilted material fastened with Velcro at the shoulders). Detainees on suicide watch may not wear glasses, even if they are legally blind without them. So, Mr. Finlinson, who wears glasses, spent the next six weeks with impaired vision. (See id.)

Once an inmate is placed on suicide watch, the decision to take the inmate off suicide watch is left to the sole discretion of the mental health professional with whom the Jail contracts for treatment of inmates. In this case, Wasatch Mental Health provided mental health services to the Jail, so Monte Memmott, a Licensed Clinical Mental Health Counselor (LCMHC) with Wasatch, who was assigned to the Jail and treated Mr. Finlinson, was the only one authorized to remove Mr. Finlinson from suicide watch. (Decl. of Dale Bench Decl. ¶ 18, ECF No. 96; see also Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J. at 12 (Pl.'s Response to Defs.' ¶ 15), ECF No. 124.)

As shown in some detail below, the record created during Mr. Finlinson's six weeks on suicide watch does not reveal concerns of staff or Mr. Memmott that Mr. Finlinson had suicidal thoughts or exhibited behavior suggesting that he was a threat to himself.

**<u>Suicide Watch Evaluations</u>**

Mr. Memmott evaluated Mr. Finlinson a total of six times before deciding to remove the suicide watch restriction.

Mr. Memmott met with Mr. Finlinson for the first time on August 11, three days after Mr. Finlinson was booked into jail and placed on suicide watch. In his notes, he wrote that Mr. Finlinson "was in a police shootout with Millard County officers." (Aug. 11, 2014 Chart Note.) And although Mr. Finlinson was reportedly "resistive to questioning and gave short, irritated, sarcastic responses," he was communicative enough to deny "suicidal ideation." (<u>Id.</u>) Nevertheless, Mr. Memmott wrote that even though Mr. Finlinson "denies suicidal ideation, … <u>due to his charges and being his frist [sic] time in jail</u>, he will remain on suicide watch for a longer observation period." (<u>Id.</u> (emphasis added).) As for concerns about medication, Mr. Finlinson, according to Mr. Memmott's chart notes, said that "he was given a shot of Haldol while in the hospital but said he [sic] doesn't do anything for him" and that he did not want medications. (<u>Id.</u>)

A week later, Mr. Memmott attempted to speak with Mr. Finlinson, who was asleep. The deputy said Mr. Finlinson was "not very social or talkative." (Aug. 18, 2014 Chart Note.) Mr. Memmott ordered that Mr. Finlinson "[r]emain on suicide watch." (<u>Id.</u>)

Mr. Memmott followed up with Mr. Finlinson two days later. At this point, Mr. Finlinson had been on suicide watch for sixteen days. Mr. Memmott recorded the notes for this second visit:

> Inmate was sleeping today but woke up briefly when counselor attempted to speak to him. He said he was fine and did not need anything. <u>Mood was not agitated or depressed</u>, but inmate just wanted to sleep. <u>He does not appear to be a danger to himself and does not appear to be suicidal,</u> <u>however he will remain on suicide watch</u> at this time <u>due to lack of interaction with staff</u>.

(Aug. 20, 2014 Chart Note (emphasis added).)

On August 26, 2014 (twenty-two days into Mr. Finlinson's suicide watch), Mr. Memmott visited Mr. Finlinson a third time:

> Inmate reports he is doing fine and <u>states he is not suicidal</u>. <u>He reports he is not really depressed and has a support system</u>. <u>He reports he was taking meds in the hospital and does not know if he needs those</u>. <u>He will be referred to the psychiatrist</u> to assess those needs. <u>He will remain on suicide watch at this time</u>. Counselor [Mr. Memmott] will follow up next week.

(Aug. 26, 2014 Chart Note (emphasis added).) When Mr. Finlinson raised the issue of medication that day, Mr. Memmott referred Mr. Finlinson's case to Travis Hunter, an APRN (Advanced Practice Registered Nurse) at Wasatch Mental Health.

Mr. Hunter visited Mr. Finlinson on August 28, 2014. He wrote that Mr. Finlinson "was very resistant to taking any medications at this time." (Aug. 28, 2014 Chart Note.) But Mr. Finlinson, who had asked about his medication only two days before (<u>see</u> Aug. 26, 2018 Chart Note), testified that rather than prescribe the necessary medication, Mr. Hunter "talked [him] into not getting Haldol." (Dep. of George Finlinson at 184:22–185:3, Ex. L to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-12.)

As for Mr. Hunter's evaluation of Mr. Finlinson's suicide watch status, he wrote that Mr. Finlinson denied "any history of self harm" although "[h]e was somewhat evasive with information." (Aug. 28, 2014 Chart Note.) He added that Mr. Finlinson did "not appear to be at risk to himself." (Id.)

Then, despite acknowledging Mr. Finlinson's need to regain competency, and with a Haldol shot due in five days, Mr. Hunter's treatment plan did not include administering Haldol: "[Mr. Finlinson] will wait to see the Judge in 2 weeks in order to see what his possible sentencing will be before starting medications." (Id. (emphasis added).) And although he said Mr. Finlinson was "very resistant to taking any medications at this time," he did not try to give Mr. Finlinson any medication. (Id.)

On September 2, 2014, Mr. Memmott visited Mr. Finlinson. According to his note, Mr. Finlinson "said he did not want to talk at the moment. He will be rescheduled. He has been in jail for about a month and has not caused any problems but he appears to mostly sleep." (Sep. 2, 2014 Chart Note (emphasis added).)

Again, one week later, Mr. Memmott evaluated Mr. Finlinson and made similar observations. "Inmate states he is not suicidal, however he states he does not care if he is on suicide watch or not. He continues to appear very indifferent about anything so he will remain on full suicide watch for his safety." (Sep. 9, 2014 Chart Note (emphasis added).) The prescribed date for Mr. Finlinson's next Haldol shot had passed.

Two weeks went by before Mr. Finlinson, still on suicide watch, was evaluated again. That day, September 23, 2014, Mr. Memmott recommended that Mr. Finlinson be released from suicide watch.

> Inmate has been in jail for about 6 weeks. <u>He has not made any</u>
> <u>efforts to harm himself in any way</u>. <u>He denies suicidal ideation</u>.
> When counselor has spoke [sic] to him, he has answered questions
> and <u>denied suicidal ideation</u>. … Reports from staff indicate that
> inmate is generally polite and compliant and <u>he has not done</u>
> <u>anything around them to indicate a suicide risk</u>. … <u>Counselor</u>
> <u>recommends this inmate be cleared for clothes</u>[8] with 30 minute
> checks. Counselor will continue to follow up. Inmate will also
> continue to be offered other forms of mental health treatment.

(Sep. 23, 2014 Chart Note (emphasis added).)

When Mr. Memmott was asked during his deposition why he kept Mr. Finlinson on

suicide watch for so long, he said it was done as a "precaution." (<u>See</u> Dep. of Monte Memmott

at 34:9–35:6, 35:22–36:3, Ex. C to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No.

125-3.)

**<u>Administrative Segregation upon Release from Suicide Watch</u>**

After Mr. Finlinson was cleared from suicide watch on September 23, 2014, Lieutenant

Killian again instructed the review team to keep Mr. Finlinson in administrative segregation.

(<u>See</u> Sep. 29, 2014 Incident Report ("To remain in Canyons 1 on ad-seg Per Lt. Killian").)

In segregation, Mr. Finlinson was isolated in a single cell. He could see through glass

walls and could theoretically talk to other segregated inmates who were housed there. According

to Mr. Finlinson, "You can talk out, and they can hear you." (G. Finlinson Dep. at 167:15–24;

<u>see also</u> <u>id.</u> at 173:3–16 (discussing very limited interaction he had with one inmate).) During

his eight-month stay, Mr. Finlinson was allowed one in-person visit (his father and sister visited

him) even though his family members went to the jail "multiple times" to see him. (Dep. of Jean

---

[8] Apparently "cleared for clothes" is a recommendation that he be released from suicide watch.
(<u>See</u> Pl.'s Mem. Opp'n to Utah County's Mot. Summ. J. at 16 (Pl.'s Response to Defs.' ¶ 25).)

Turner at 103:5–25, Ex. M to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-13; Dep. of Vance Finlinson at 132:25–133:13, Ex. J to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-10; G. Finlinson Dep. at 175:6–23.)

Two months later, Lieutenant Killian reaffirmed her decision to keep him in administrative segregation.  (Nov. 17, 2014 Incident Report ("Remain on ad-seg.  He has mental health issues and <u>his charges are attempted aggrevated [sic] murder</u>.") (emphasis added).)  At Lieutenant Killian's direction, Mr. Finlinson stayed in administrative segregation until his release on April 14, 2015.  (<u>See, e.g.</u>, Nov. 24, 2014 Incident Report (same decision, same reason as that given in November 17, 2014 report); Dec. 1, 2014 Incident Report (same) ("He will remain on ad-seg at least until he has been cleared by the mental health staff."); Dec. 8, 2014 Incident Report (same).)

Sheriff Tracy said he heard no complaint about Mr. Finlinson's housing status and that Mr. Finlinson did not file a grievance.  (Decl. of Jim Tracy ¶ 6, ECF No. 94.)  But according to Jail Commander Darin Durfey, the housing lieutenant's decision to place a prisoner on suicide watch or in administrative segregation is not an appealable issue.[9]  (Dep. of Darin Durfey at 74:7–22, Ex. B to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-2.)

---

[9] Mr. Finlinson's family attempted to voice their concerns to the Jail administration with limited success.  (<u>See</u> V. Finlinson Dep. at 129; Turner Dep. at 105–06; Dep. of Dale Bench at 85–86 (stating that privacy laws prohibit him from discussing the medical care of a detainee with the detainee's family), Ex. A to Pl.'s Mem. Opp'n to Utah County Mot. Summ. J., ECF No. 125-1; Email chain dated Oct. 20, 2014 and Oct. 21, 2014, Ex. I to Pl.'s Mem. Opp'n to Utah County Mot. Summ. J., ECF No. 125-9.)

**Haphazard Administration of Medication**

Mr. Finlinson was detained pending trial but could not go to trial until he was found mentally competent. To become competent, he needed regular injections of Haldol.

There were times when Mr. Finlinson was "resistant" to taking the medicine. But the Jail did not administer the medication as prescribed (that is, it did not offer the medication to Mr. Finlinson when it was due).[10] Instead, he received doses sporadically. The medical records from the Jail do not clearly indicate when those doses were given, although it is clear that Mr. Finlinson did not receive the shots as prescribed and that at times it took prompting from Mr. Finlinson's attorney,[11] Mr. Finlinson,[12] and his family members to get the Jail to administer some of the shots.

---

[10] The Jail had notice of the prescription, although it's not clear whether it obtained a copy of it. Upon arrival at the Jail, Mr. Finlinson was interviewed by the intake deputy, who noted, in an entry titled "Medication Verification," that "[p]atient was given a monthly injection 3 days ago. He is scheduled for mental health for evaulation [sic] and possible continuation of medication." (Aug. 8, 2014 Chart Note.)

[11] On October 20, 2014, Mr. Finlinson's attorney contacted Utah County and talked with Mark Worthington. The attorney asked Mr. Worthington if Utah County had administered Mr. Finlinson's medication. According to Mr. Worthington, he told Plaintiff's attorney that "if [he] wanted that information they needed to submit a GRAMA request to the Utah County Attorney's office." (Email chain dated Oct. 20, 2014 and Oct. 21, 2014, at Bates No. 2851.) Mr. Bench intervened and called Dr. Tubbs (the jail medical provider), who approved the medication Mr. Finlinson had asked for two months earlier (and which had already been prescribed by a physician at the hospital). Mr. Finlinson received the Haldol injection. But by then he had missed two doses.

[12] The record contains evidence that Mr. Finlinson refused to take his medication. But there is also evidence that he asked why he had not received his Haldol. During an August 26, 2014 evaluation, Mr. Memmott noted that Mr. Finlinson reported that "he was taking meds in the hospital and does not know if he needs those." Mr. Memmott, despite Mr. Finlinson's prescription, simply said Mr. Finlinson would "be referred to the psychiatrist to assess those needs." (Aug. 26, 2014 Chart Note (emphasis added).)

According to his sister, when Mr. Finlinson did not get his medication regularly, he denied the need to take the medicine. (See Turner Dep. at 106:20–24 ("I was aware that he chose not to take medications after he hadn't had them for two months.").) The Jail's failure to properly administer the medication arguably contributed to Mr. Finlinson's refusal to take the Haldol, which, in turn, inhibited his ability to regain competency, all of which significantly extended his time in jail. (See V. Finlinson Dep. at 128:21–25 ("At one point when he had not had [Haldol] for several months . . . he had all the signs that put him in the problem in the first place").)

On December 5, 2014, approximately four months after he was booked in the Utah County Jail, a state court held that he was not competent because he was not receiving his medication. (See Dec. 5, 2014 Order Committing Def. to Utah State Hospital, Ex. T to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-20.) The medical examiners agreed that Mr. Finlinson's "mental health is affected by his refusal to take medications prescribed to treat his mental illness." (Id. at 2 ¶ 1.) Although the record contains references to Mr. Finlinson's resistance or refusal, it also demonstrates that the Jail did not offer Mr. Finlinson his medication on the prescribed schedule. Even if he refused, he could only have refused at the times when the Jail offered the shots, which was erratic.

On January 14, 2015, the state court ordered Mr. Finlinson to check in to the Utah State Hospital where he would receive treatment to be restored to mental competency. At that point, he was forty-fifth on the waiting list. (Jan. 14, 2015 Chart Note.) Finally, on April 14, 2015, the Jail released Mr. Finlinson.

## ANALYSIS

Mr. Finlinson has filed suit against the individual officers involved in his capture, Millard County, and Utah County, for violating his civil rights. Millard County and the Millard County officers, Agent Adams, and Utah County have each filed separate motions for summary judgment. The court will first address the assertions of qualified immunity by the individual officers involved in his capture (the "Officer Defendants"), and then address the liability of both counties.

**OFFICER DEFENDANTS**

Mr. Finlinson alleges, under multiple theories, that the Officer Defendants violated his Fourth Amendment right to be free from unreasonable search and seizure.[13]

The parties, through their briefing, have identified three discrete, potential constitutional violations: first, that Deputy Thomas and Agent Adams used excessive force when they shot Mr. Finlinson at the end of the car chase; second, that Deputy Blad used excessive force by tasing Mr. Finlinson after he had been shot; and third, that the officers' group effort to capture him— both the initial plan and ensuing chase—were reckless and caused the use of force.

Mr. Finlinson contends that all of the Officer Defendants should be liable for all three possible violations. That is, he brings claims against the officers who actually used force as well as those who did not. He argues that the non-shooting and non-tasing officers participated in the

---

[13] Mr. Finlinson also alleges that the Officer Defendants violated his Fourteenth Amendment right to be free from excessive force. (Am. Compl. ¶ 95, ECF No. 57.) But because his claims against the Millard County Defendants arise from the events leading up to and including his initial seizure, only the Fourth Amendment applies. See Porro v. Barnes, 624 F.3d 1322, 1325 (10th Cir. 2010).

constitutional violations, and that they failed intervene to stop the violations. He makes a similar argument about the events preceding the shooting and tasing—that all of the officers participated in, and failed to intervene to stop, the group effort that led to the use of force against him.

Finally, Mr. Finlinson argues that Sheriff Dekker and Lieutenant Burton are liable as supervisors.

The Officer Defendants move for summary judgment, contending that every officer involved is entitled to qualified immunity as a matter of law.

## I.      Excessive Force

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis omitted). The standard balances the "nature and right of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Id. at 396 (internal quotations omitted).

The standard is objective, and "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." Id. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard for their underlying intent or motivation." Id. at 397.

Reasonableness is determined by evaluating the totality of the circumstances. Weigel v. Broad, 544 F.3d 1143, 1151 (10th Cir. 2008). The court must pay "careful attention to the facts of the case and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others,

and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 1151-52 (quoting Graham, 490 U.S. at 396).

These three Graham factors are not exclusive. The Tenth Circuit has instructed that "a person's mental health "must be taken into account when considering the officers' use of force and it is therefore part of the factual circumstances the court considers under Graham." Giannetti v. City of Stillwater, 216 Fed. Appx. 756, 764 (10th Cir. 2007).

Moreover, "[t]he excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force." Allen v. Muskogee, Okla., 119 F.3d 837, 840 (10th Cir. 1997). Stated more precisely, "the reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Id. (quoting Sevier v. City of Lawrence, Kan., 60 F.3d 695, 699 (10th Cir.1995) (alteration marks omitted)); see also Graham, 490 U.S. at 394–95 ("[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out." (emphasis in original)).

## II. Standard of Review

"Summary judgment should be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Koch v. City of Del City, 660 F.3d 1228, 1238 (10th Cir. 2011) (citing Fed. R. Civ. P. 56(a)). It should not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986). The court must draw all reasonable inferences in a light most favorable to Mr. Finlinson, the non-moving party. <u>Koch</u>, 660 F.3d at 1238.

Because the officers here raise the defense of qualified immunity, the burden on summary judgment shifts. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). It provides "immunity from suit rather than a mere defense to liability." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (emphasis omitted).

Though the court must still view the facts in a light most favorable to the non-moving party, Mr. Finlinson bears the two-part burden of demonstrating (1) that the officers violated his constitutional rights, and (2) that the law supporting the violation was clearly established when the alleged constitutional violation occurred. <u>Tenorio v. Pitzer</u>, 802 F.3d 1160, 1164 (10th Cir. 2015). The court may examine either part first "in light of the circumstances in the particular case at hand." <u>Pearson</u>, 555 U.S. at 236.

Mr. Finlinson alleges constitutional violations arising from three phases of his capture— his shooting, his tasing, and the overall plan to commit him, which he claims was reckless and caused the use of force against him. The Officer Defendants argue that qualified immunity bars every claim against them. The court must consider each phase of the incident, and each officer's role in it, to determine whether qualified immunity applies.

**A.      Deputy Thomas and Agent Adams (the Shooting Officers)**

**1.      Constitutional Right Violation**

Deputy Thomas and Agent Adams claim that their use of force against Mr. Finlinson—shooting him six times at the end of the chase—was objectively reasonable because, when they shot him, he was using his vehicle to attack the officers.  Mr. Finlinson contends that the officers shot him only after his truck had clearly become high-centered in the irrigation ditch running along the road when he no longer posed a threat.  The court concludes that the differing accounts present a genuine question of fact and that, at this stage, Mr. Finlinson has presented sufficient evidence of a constitutional violation.

Turning to the Graham factors, the shooting officers try to tilt the first factor (the severity of the crime at issue) in their favor by portraying Mr. Finlinson as a suspected criminal from the beginning of the incident.  They argue that the "initial crime" of driving on a suspended license "spurred the events" leading to his shooting and tasing.  (Def. Adams' Mot. Summ. J. at 17, ECF No. 102 (internal quotation marks omitted).)  They also list some thirteen "chargeable offenses" committed by Mr. Finlinson during the course of the car chase, ranging from disorderly conduct to attempted murder.  (Id. at 18 n.6.)

Mr. Finlinson responds that he had committed no crime—that the officers "were being asked to apprehend [him] solely to initiate the process of involuntary commitment so [he] could get help for his mental illness."  (Pl.'s Mem. Opp'n to Millard Cnty.'s Mot. Summ. J at 63, ECF No. 121.)  He contends that the first factor should weigh in his favor.

The first Graham factor weighs in favor of the shooting officers, though not as heavily as the officers suggest. While police may first encounter individuals because of minor offenses, crimes committed during the course of an encounter can justify deadly force.

The court recently considered just such a case, in which police officers attempted to pull over a pickup truck for driving at night without headlights. Johnson v. Peay, No. 1:14-cv-147-TC, 2016 WL 4186956, at *2 (D. Utah Aug. 8, 2016), aff'd 704 Fed. Appx. 738 (10th Cir. 2017). The driver refused to pull over, and instead led officers on a thirty minute car chase. The chase culminated on a rural road, with the driver—who, it was later found out, had a blood alcohol level of 0.358—ramming the officers' cars. An officer, thinking another officer was in danger, fired a single shot that hit the driver in the eye. The court found that the first Graham factor weighed in favor of the officer because "the danger that [the driver] posed at the time of the shooting had nothing to do with her headlights and everything to do with the maneuvering of a big pickup truck in an aggressive way in close proximity to officers." Id. at *6.

Here too, the court will look to the crime that caused the officers' use of deadly force—in this case, Mr. Finlinson's effort to ram his pickup truck into Deputy Blad. While the officers' initial reason for attempting to stop Mr. Finlinson did not justify deadly force, the first Graham factor nonetheless weighs in favor of the officers.

The second and third Graham factors—whether the suspect poses an immediate threat to the safety of the officers or the public, and whether the suspect is actively resisting arrest—must be analyzed "at the precise moment that the officer used force." Estate of Ronquillo by and through Estate of Sanchez v. City & Cnty. of Denver, 720 Fed. Appx. 434, 438 (10th Cir. 2017).

Mr. Finlinson was undisputedly evading the officers until his truck became stuck in the ditch, so the third factor weighs in favor of the officers.

The second factor—immediacy of harm—is a much closer call. Mr. Finlinson alleges that the officers used excessive force because they shot him after his truck was disabled, when neither he nor his truck posed a threat to the officers.

The shooting officers question the veracity of Mr. Finlinson's testimony about when he was shot. They contend that they stopped shooting once the truck was high-centered in the ditch. Alternatively, the officers maintain that even if they fired shots after Mr. Finlinson's truck stopped, their use of force was reasonable given the totality of the circumstances—especially Mr. Finlinson's actions during the chase of driving towards the officers' vehicles (Mr. Finlinson hit the officers' vehicles six separate times with his truck).

The court must view the facts in the light most favorable to Mr. Finlinson. As a result, the second Graham factor weighs in his favor.

"It is well-settled that vehicles may be used as weapons and that such use 'may allow the use of deadly force,' because 'it goes without saying that an officer in close quarters is no match for a two-ton vehicle.'" Johnson, 704 Fed. Appx. at 744 (quoting Durastanti, 607 F.3d at 665, 671)). But the threat of harm to the officers or the public must be "actual and imminent" to "shift the calculus in the direction of reasonableness." Cordova v. Aragon, 569 F.3d 1183, 1190 (10th Cir. 2009). And "circumstances may change within seconds eliminating the justification for deadly force." Durastanti, 607 F.3d at 666.

In this case, genuine issues of material fact prevent the court from determining whether the shooting officers faced—or reasonably perceived—an immediate threat when they shot Mr.

Finlinson. The court must view the facts in the light most favorable to Mr. Finlinson and assume that his truck was disabled after it hit the ditch. The witness video allows for such an inference. The court must also assume that the officers continued firing at and hit Mr. Finlinson after his truck was completely disabled, when he no longer posed an immediate threat. Under these facts, the second Graham factor weighs in favor of Mr. Finlinson. And the court finds the second factor dispositive here: though a close call, a jury could conclude that Deputy Thomas' and Agent Adams' actions in firing at Mr. Finlinson were not objectively reasonable.

## 2. Clearly Established

The court also finds that the right asserted by Mr. Finlinson was clearly established at the time the incident occurred. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citations omitted).

To determine whether the right at issue is clearly established, the court considers whether Supreme Court or Tenth Circuit case law, or the weight of authority from other circuits, put an official on notice that his or her conduct was unconstitutional. Cortez v. McCauley, 478 F.3d 1108, 1114–15 (10th Cir. 2007) (en banc). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." District of Columbia. v. Wesby, 138 S. Ct. 577, 590 (2018). And "[t]he rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

The Tenth Circuit's decision in Fancher v. Barrientos, 723 F.3d 1191 (10th Cir. 2007), established that shooting Mr. Finlinson after his car plainly had become disabled would amount

to a constitutional violation. In <u>Fancher</u>, a suspected thief running on foot from an officer jumped into the driver's seat of the officer's unoccupied patrol car, which had two loaded guns inside. As the suspect shifted the car into reverse, the officer, who stood next to the car, shot at the suspect's chest and saw his body slump. The officer then stepped away as the car rolled backwards away from him. Five to seven seconds after the officer fired his first shots, he fired again. The district court denied the officer's claim of qualified immunity, finding that a reasonable jury could conclude that the officer "had time between the first shot and the following shots to take a few steps back to get out of the way of the car, to assess the situation, and to know that [the suspect] had slumped and may not have presented a continuing danger to himself or to the public." <u>Id.</u> at 1200 (quotation marks omitted). The Tenth Circuit affirmed.

Certainly, as the shooting officers argue here, the reasonable perception of an immediate threat, even if mistaken, may justify deadly force. <u>See, e.g.</u>, <u>Durastanti</u>, 607 F.3d at 660; <u>Johnson</u>, 704 Fed. Appx. at 743; <u>Estate of Ronquillo</u>, 720 Fed. Appx. at 439. But <u>Fancher</u> makes clear that as soon as the threat (or perception of it) abates, even if in a matter of seconds, deadly force may no longer be justified. At this juncture of the case, Deputy Thomas and Agent Adams are not entitled to qualified immunity.

### B.     Deputy Blad (Tasing Officer).

#### 1.     Constitutional Right Violation

As with the shooting, the facts under the first <u>Graham</u> factor (the severity of the crime) weigh in favor of Deputy Blad. The officers initially planned to take Mr. Finlinson into custody to civilly commit him. At that time Mr. Finlinson had not committed any crime. But during the

pursuit, his actions resulted in a series of charges of violence against the officers trying to seize him.

The second and third <u>Graham</u> factors, however, weigh in favor of Mr. Finlinson.

Under the second factor, Mr. Finlinson, at best, posed an "immediate threat" of hitting one of officers with his fist (or, perhaps kicking an officer, although the video does not capture Mr. Finlinson's position or to what extent he was "free" to cause physical harm).

As for the third factor, the record does not show an attempt to escape, although Mr. Finlinson unquestionably resisted being taken into custody.

But the question is not whether the officers needed to protect themselves from physical harm and to take Mr. Finlinson into custody. The question is whether the type and degree of force Deputy Blad used was excessive.

Although use of a taser certainly is preferable to deadly force, it is still a harsh method to subdue a person. A taser, by design, delivers an intense shock that causes great pain and is intended to disable the suspect.

> [The defendant officer's] weapon of choice was a Taser—a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain. . . . Although Tasers may not constitute deadly force, their use unquestionably "seizes" the victim in an abrupt and violent manner. Accordingly, the "nature and quality" of the intrusion into the interests of [the plaintiff] protected by the Fourth Amendment [can be] quite severe.

<u>Cavanaugh v. Woods Cross City</u>, 625 F.3d 661, 665 (10th Cir. 2010).

Here, the court is looking at the level of force used, i.e., the number of times the taser was used and the intensity of the tasing, when compared to the threat Mr. Finlinson posed to Deputy

Blad and the other officers at that moment in time.  The court is also looking at the timing of Deputy Blad's use of the taser.

> Force is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force. Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times.  It's the totality of the circumstances, not the first forcible act, that determines objective reasonableness.

Cyrus v. Town of Mukwonago, 624 F.3d 856, 863 (7th Cir. 2010) (internal citations omitted).

The initial tasing apparently occurred after Mr. Finlinson hit Lieutenant Burton.  But then, as Mr. Finlinson was struggling under the "dog pile," Deputy Blad tased him twice without warning.  Each tasing lasted five-seconds and were just a few seconds apart.

Mr. Finlinson is reportedly a large, strong man, but he was unarmed (his truck had been disabled) and he was suffering from multiple gunshot wounds, as was apparent to the officers, including Deputy Blad.  "I could see blood on him … I figure he was hit …."  (Blad Interview Tr.)  He was being subdued by three to four[14] trained and armed officers.  The events occurred on a remote dirt road with no realistic means of escape—assuming, of course, that Mr. Finlinson could break through the group of officers closely surrounding his truck.  Yet he was repeatedly tased while under a "dog-pile."  The screams that can be clearly heard on the recording during the second and third tasing cycles (which lasted five seconds) indicate he was in acute pain.  (See Blad Outside Dash Cam at 33:12–33:31.)  Under those circumstances, a reasonable jury could

---

[14] The record is not clear about the number of officers in direct contact with Mr. Finlinson (the struggle was not caught on video tape and the limited statements provided by the parties are vague).

conclude that Mr. Finlinson was not an immediate threat or a flight risk that would warrant a reasonable officer to tase him multiple times.

Deputy Blad asserts that Mr. Finlinson was not subdued until he was handcuffed and that the tasings occurred before then. (See Millard Cnty. Reply Supp. Mot. Summ. J. at 18, ECF No. 147.) That, he says, justifies the multiple tasings. But the evidence is not as clear as Deputy Blad suggests.

The most "reliable" account of what occurred during the struggle and tasing is a low quality audiotape. (See, e.g., Blad Outside Dash Cam at 33:05–33:31.) Clearly a struggle was occurring, but the only points of clarity are the orders of the officers, the crackling of the taser, and Mr. Finlinson's screams and moans. The tape does not reveal the level of Mr. Finlinson's resistance, the level of physical control the officers had over Mr. Finlinson, the timing of the tasings, or the effect they had on Mr. Finlinson. Nor does it reveal the timing of the handcuffing, and whether Mr. Finlinson was "effectively subdued" before being handcuffed (the cases do not require a finding that a suspect is only subdued once handcuffed, and the "totality of the circumstances" test necessarily requires a case-by-case analysis).

In an interview conducted shortly after the incident, Deputy Thomas briefly described what he saw. He said Mr. Finlinson

> hit [Lieutenant Burton] once, almost knocked him to the ground. Ah, I stepped in, and then it's, like he's, dog piled, there's like 3 of them on him. So I stepped back[,] they ah, he was up on his feet again, Blad deployed a taser. Ah, he went to the ground and he was still kickin and fightin. I think he, ah, I think he gave him 3 rides on that taser. And then he finally submitted and they got him hooked….

(Excerpt from Tr. of Thomas Interview.) But Deputy Thomas's untested statement does not

definitively answer some of the questions raised above.

In sum, the court finds that, reading the facts in a light most favorable to Mr. Finlinson, Mr. Finlinson has presented sufficient evidence to survive summary judgment at this stage. The evidence suggests that Mr. Finlinson may have been effectively subdued before Deputy Blad tased him for a third time. Accordingly, a reasonable jury could conclude that Deputy Blad's use of the taser was not objectively reasonable under the facts and circumstances confronting him.

### 2. Clearly Established

At the time of the incident, case law in the Tenth Circuit and other jurisdictions clearly established that the use of force, including use of a taser or other debilitating device like pepper spray, on a suspect who is effectively subdued is excessive. In <u>Perea v. Baca</u>, the Tenth Circuit held that in 2011 (when the incident in that case occurred), it was clearly established law that "officers may not continue to use force against a suspect who is effectively subdued." 817 F.3d 1198, 1204 (10th Cir. 2016). Under the facts of that case—in which an officer continued to tase the suspect after he was subdued—the court denied the officers' motion for qualified immunity. The court rejected the officers' reliance on an earlier decision which had held that the "use of taser multiple times was justified against an arrestee who was 'actively and openly resisting'":

> Appellants are correct that we have never held that use of a taser, in and of itself, constitutes excessive force. But <u>disproportionate use of a taser, and repeated use of a taser against an effectively subdued individual, are clearly established constitutional violations.</u> Although we are deeply troubled by the sheer number of times the officers deployed the taser in under two minutes, we do not set a specific limit on the number of times an arrestee may be tased within a given time interval. We simply affirm the district court holding that, <u>under our precedent, no reasonable officer could conclude that continuing to taser a subdued detainee is constitutional.</u>

Id. at 1205 n.4 (emphasis added). The Perea court cited to law in existence at the time of the

tasing:

> [I]t is . . . clearly established that officers may not continue to use force against a suspect who is effectively subdued. See, e.g., Fancher v. Barrientos, 723 F.3d 1191, 1201 (10th Cir. 2013) (although a single shot by an officer may have been justified, the following six shots were clearly unlawful because they occurred after arrestee no longer posed a threat of serious harm); Dixon, 922 F.2d at 1463 (continuing to strike detainee after he had been subdued was clearly unconstitutional); Herrera v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 361 Fed. Appx. 924, 929 (10th Cir. 2010) (unpublished) (use of force against detainee who officers initially believed would flee, but who demonstrated that further flight was unlikely, was clearly excessive); Gouskos v. Griffith, 122 Fed. Appx. 965, 977 (10th Cir.2005) (unpublished) (officer's continued use of force against a subdued arrestee precluded qualified immunity). … [O]ur precedent is clear that continued use of force after an individual has been subdued is a violation of the Fourth Amendment.

Id. at 1204–05.

Mr. Finlinson has satisfied the second prong of the qualified immunity analysis. Because

he has also submitted evidence from which a reasonable jury could find that Deputy Blad

violated Mr. Finlinson's right to be free from excessive force, the court finds that Deputy Blad is

not entitled to qualified immunity from liability for tasing Mr. Finlinson.

## C.     The Non-Shooting and Non-Tasing Officers

Mr. Finlinson does not limit his excessive force claims to the officers who actually shot

and tased him. He alleges that each Defendant officer is liable for participating in, and for

failing to intervene to stop, both uses of force.

Section 1983 extends liability to any person who "subjects, or causes to be subjected, any

citizen . . . to the deprivation of any rights . . . secured by the Constitution." 42 U.S.C. § 1983

(emphasis added). Liability can thus extend to officers who actively participate in a coordinated use of excessive force, as well those fail to intervene to prevent another officer's use of force. Estate of Booker v. Gomez, 745 F.3d 405, 422 (10th Cir. 2014).

### 1. Participation

Mr. Finlinson has not produced sufficient evidence to support his claim that the non-shooting officers actively participated in the shooting that occurred <u>after</u> Mr. Finlinson's truck became stuck the ditch. The parties do not dispute that only Deputy Thomas and Agent Adams might have fired shots at this time. Deputy Blad had stopped firing, Sheriff Dekker and Lieutenant Burton remained in their vehicles, and Deputy Mitchell was stuck in Deputy Blad's truck.

The tasing is a different matter. Unlike the shooting, in which Deputy Thomas and Agent Adams were the only two participants, the tasing involved a "dog pile" of officers trying to subdue Mr. Finlinson. The Tenth Circuit in <u>Estate of Booker</u> clearly established that such a situation amounts to a "group effort," and each officer may be held liable even if only one used the taser. <u>Id.</u> The record is not clear about which officers tried to subdue Mr. Finlinson, but the identity of the those officers presents a genuine issue of material fact that prevents the court from granting qualified immunity to the officers on the scene.

### 2. Failure to Intervene

The Tenth Circuit has clearly established that police officers may be liable under § 1983 for failing to intervene to prevent other officers from using excessive force. <u>Mick v. Brewer</u>, 76 F.3d 1127, 1136 (10th Cir. 1996). To be held liable, "the officers must have 'observed or had reason to know' of a constitutional violation and have had a 'realistic opportunity to intervene.'"

Jones v. Norton, 809 F.3d 564, 576 (10th Cir. 2015) (quoting Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008)) (alteration marks omitted).

The witness video of the shooting does not support an inference that the non-shooting officers could have intervened to prevent the shooting. Despite the video's limitations, it establishes that the shooting was continuous and only lasted, at most, approximately seven seconds after Mr. Finlinson's truck stopped. Even if the non-shooting officers witnessed Deputy Thomas and Agent Adams firing at Mr. Finlinson's disabled truck, they did not have time to intervene to stop the shooting.

However, Mr. Finlinson has presented sufficient evidence to show that all of the officers on the scene of the tasing had a chance to intervene. Unlike the shooting, which lasted just seconds, the tasing incident spanned about a minute. And Deputy Blad tased Mr. Finlinson three separate times (the first attempt had no effect). While facts of the tasing are in dispute, the evidence suggests that the other officers on the scene had time to intervene to prevent the use of excessive force. At this stage of the case, the officers are not entitled to qualified immunity for the tasing.

### D.    Group Effort to Take Mr. Finlinson Into Custody

The court's inquiry is not confined to the precise moment the officers shot or tased Mr. Finlinson. "The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004) (quoting Sevier, 60 F.3d

at 699).  "This rule is simply a specific application of the 'totality of the circumstances' approach inherent in the Fourth Amendment's reasonableness standard."  Id. (internal quotation omitted).

The rule is subject to two limitations.  First, as noted, an officer's conduct must be reckless or deliberate.  Id.  "Mere negligent actions precipitating a confrontation" are not actionable.  Sevier, 60 F.3d at 699 n.7.  Conduct is reckless when done despite "a known or obvious risk that was so great as to make it highly probable that harm would follow."  Safeco Ins. Co. v. Burr, 551 U.S. 47, 68 (2007) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 34, at 213 (5th ed. 1984)).

Second, the events must be "'immediately connected' to the suspect's threat of force." Allen, 119 F.3d at 840 (quoting Romero v. Bd. of Cnty. Comm'rs, 60 F.3d 702, 705 n.5 (10th Cir. 1995)).  As the Supreme Court recently clarified, the central question is whether the officers' preceding actions were the proximate cause of the threat of force.  See Cnty. of Los Angeles, Calif. v. Mendez, 137 S.Ct. 1539, 1548–49 (2017); see also Allen, 119 F.3d at 840, 841 (considering whether preceding events "created" or "precipitated the need to use deadly force"); Hastings v. Barnes, 252 Fed. Appx. 197, 203 (10th Cir. 2007) (asking whether "the officers' own conduct during the seizure unreasonably created the need to use such force") (emphasis added). If officers' earlier actions "are attenuated by time or intervening events," they do not factor into the reasonableness inquiry.  Sevier, 60 F.3d at 699 n.8.

### 1. Constitutional Right Violation.

A reasonable jury could conclude that the officers' plan to civilly commit Mr. Finlinson caused the need to use deadly force.  As an initial matter, the officers were not called upon to arrest Mr. Finlinson, but rather to effect a civil commitment.  Distinct from a criminal arrest, the

government has an interest in this circumstance "in protecting a mentally ill person from self-harm."[15]  Pino v. Higgs, 75 F.3d 1461, 1468 (10th Cir. 1996).

The officers knew Mr. Finlinson was in the midst of a mental health crisis caused by his schizophrenia.  They also knew that he became belligerent and resisted arrest during a previous, valid traffic stop.  They expected a fight from the outset.

But they did not factor Mr. Finlinson's specific diagnosis into their plan.  And rather than try to avoid another confrontation—for example, by intercepting Mr. Finlinson outside of his home, before he got into his truck—the officers decided to carry out another traffic stop, this time using a caravan of five police vehicles.  Considering Mr. Finlinson's mental state, his resistance was a reasonably foreseeable result of such a bewildering show of force.

When Mr. Finlinson refused to stop, the officers had no backup plan.  Deputy Thomas used his loudspeakers to command Mr. Finlinson to pull over, but the officers did not communicate why they sought to pull him over or otherwise attempt to de-escalate the chase.  When the commands failed, the officers tried to trap Mr. Finlinson with their vehicles at the end of Anderson Lane.  And when that in turn failed, and Mr. Finlinson finally stopped on his own, Deputy Blad yelled "Come on!" at Mr. Finlinson, apparently antagonizing him.  Deputy Thomas then fired three rounds at Mr. Finlinson himself.

From beginning to end, the officers treated Mr. Finlinson as a dangerous criminal suspect, and never as a man in the throes of a mental health crisis.  A reasonable jury could

---

[15] That interest is reflected in Utah's temporary civil commitment statute, which allows a police officer called upon to commit an individual to decline to do so if the officer "had probable cause to believe, based on the officer's experience and de-escalation training that taking an individual into protective custody . . . would increase the risk of substantial danger to the individual or others."  Utah Code Ann. § 62A-15-629(5)(b).

conclude that the officers' actions before shooting and tasing Mr. Finlinson—both their plan and the resulting chase—were reckless and caused the ultimate use of force.

### 2. Clearly Established

Mr. Finlinson asserts that every officer who participated in his chase and capture is liable for participating in the group effort that caused the use of force. In turn, every officer claims qualified immunity. Accordingly, even if a jury concludes that the officers' reckless conduct caused the use of force, the officers must have been on notice that their conduct was objectively unreasonable.

At the time of the incident, Tenth Circuit case law clearly established that an officer acts unreasonably when he or she threateningly confronts a mentally ill individual without gaining additional information or first approaching in a nonthreatening manner. In Hastings v. Barnes, for instance, officers responded to a suicidal man who had called a social services provider to seek counseling. 252 Fed. Appx. at 198–99. Though the officers were only conducting a welfare check, one had already drawn his gun and pepper spray when they approached his house.

The man opened the door part way when officers knocked and confirmed that he had called seeking counseling and was suicidal. The officers described his behavior as "real nervous," "agitated," and "a little evasive." Id. at 199 (quotation marks omitted). The officers asked the man to step onto the porch twice, and he refused both times. The man then tried to slam the door on the officers and ran into his bedroom, where he picked up a samurai sword. The officers followed him into his house and, with guns drawn, crowded the doorway of the bedroom, effectively trapping him. They repeatedly and unsuccessfully ordered him to drop the sword, which he held like a baseball bat. When the man lowered the sword to pick up his

phone—the intake worker he had first called was still on the line—the officers pepper sprayed him in the face. The pepper spray did not work; the man began moving towards the officers, but the doorway was too crowded for the officers to retreat. Two officers shot the man four times, killing him.

The Tenth Circuit held that the shooting, "viewed in isolation . . . was objectively reasonable," but that the officers' actions precipitated the use of force, rendering it unreasonable. Id. at 203. The man "was not a criminal suspect," but rather a "potentially mentally ill/emotionally disturbed individual who was contemplating suicide and had called for help." Id. The officers provoked the man by crowding themselves in the doorway, issuing "loud and forceful commands," and pepper-spraying him. Id. The Court held that "[a] reasonable jury could find that under these facts, [the officers'] actions unreasonably escalated the situation to the point deadly force was required." Id.

Hastings follows a similar, published decision, Sevier v. City of Lawrence. In Sevier, officers responding to a welfare check crowded into the bedroom of an emotionally-distraught young man who held a butcher knife. 60 F.3d at 697–98. According to the officers, the young man lunged towards them with the knife; according to the young man's parents, he only stood with the knife by his side. In either event, the officers shot the young man six times, killing him.

The district court denied the officers' motion for summary on the grounds of qualified immunity. The Tenth Circuit affirmed, noting that the record contained "some evidence upon which a jury could conclude that Defendants acted recklessly by confronting [the young man] in the manner that they did after knowing that he was armed and distraught over problems he was

having with his girlfriend, and without gathering more information on the situation." Id. at 701 n.10.

Likewise here, evidence in the record shows that the officers attempted to take Mr. Finlinson into custody using an outsized show of force, and without first considering the likely consequences in light of Mr. Finlinson's known mental health problems. When that plan failed, the officers tried to trap him with their vehicles and shoot him. They never once tried to explain their pursuit or otherwise de-escalate the chase. Hastings and Sevier clearly established that this conduct, undertaken to commit a man suffering from paranoid schizophrenia, was objectively unreasonable.

Moreover, every officer may be liable under § 1983 for participating in the group effort to take Mr. Finlinson into custody. See, e.g., Stewart v. City of Prairie Village, Kan., 904 F.Supp.2d 1143, 1157–58 (D. Kan. 2012). The initial plan consisted of a coordinated show of force, then quickly devolved into a chase in which all the officers participated.

Every officer may also be liable for failing to intervene to stop the events that caused his shooting and tasing. See id. at 1158. The record shows that the officers, while waiting for Mr. Finlinson to begin his drive, had time to stop and reformulate the plan to take him into custody. For instance, the officers could have gathered more information about Mr. Finlinson's mental state to understand and avoid the likely consequences of the initial plan. The officers could have approached Mr. Finlinson in a non-threatening manner. They also could have intercepted him outside of his house, before he got into his truck and behind the wheel of a potentially deadly weapon. Based on the record, the officers had realistic opportunities to stop the reckless plan to take Mr. Finlinson into custody.

### E. Sheriff Dekker and Lieutenant Burton as Supervisors

Mr. Finlinson contends that both Lieutenant Burton and Sheriff Dekker are liable as supervisors for the use of force against him because both "'set in motion' and directly participated in the reckless plan to trap [him], and knew or should have known that the plan would cause the Officer Defendants to deprive [him] of his constitutional rights." (Pl.'s Mem. Opp'n to Millard Cnty.'s Mot. Summ. J. at 89.)

A supervisor can be liable for their subordinates under § 1983, but not under a theory of respondeat superior. Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009). Rather, a supervisor must have violated a plaintiff's constitutional right "by virtue of his own conduct and state of mind." Dodds v. Richardson, 614 F.3d 1185, 1198 (10th Cir. 2010).

To succeed on a claim of supervisory liability, a plaintiff must demonstrate an "'affirmative link' between the supervisor and the constitutional violation." Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013) (quoting Dodds, 614 F.3d at 1195. The "affirmative link" requirement has three related elements: "(1) personal involvement; (2) causation; and (3) state of mind." Id.

The court will start with the second element, causation, because Lieutenant Burton satisfies the element but Sheriff Dekker does not. "The second element 'requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation' by setting 'in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights.'" Estate of Booker v. Gomez, 745 F.3d 405, 435 (10th Cir. 2014) (quoting Schneider, 717 F.3d at 768).

The record shows that Lieutenant Burton alone formulated and implemented the plan to take Mr. Finlinson into custody. And, as discussed above, a reasonable jury could find the plan was reckless and caused the use of force against Mr. Finlinson. The facts support the claim that Lieutenant Burton "set the wheels of the alleged constitutional violation in motion." Fogarty v. Gallegos, 523 F.3d 1147, 1163 (10th Cir. 2008).

Sheriff Dekker, on the other hand, was simply aware of his lieutenant's plan. Lieutenant Burton discussed the plan with Sheriff Dekker at the retirement party in Fillmore, and Sheriff Dekker called during the chase for updates (and would later join as a participant). But "a supervisor's mere knowledge of his subordinate's conduct" is insufficient to establish liability. Schneider, 717 F.3d at 767 (quoting Iqbal, 556 U.S. at 677) (quotation marks omitted).

Turning to Lieutenant Burton alone, the court finds sufficient evidence to support the first element of supervisory liability, personal participation. The contours of the first element "are still somewhat unclear" after the Supreme Court's decision in Iqbal, "which 'articulated a stricter liability standard for personal involvement.'" Estate of Booker, 745 F.3d at 435 (quoting Schneider, 717 F.3d at 768); see generally Dodds, 614 F.3d at 1197-99 (discussing the effect of Iqbal on supervisory liability, but noting that "consensus as to its meaning remains elusive"). But even after Iqbal, the Tenth Circuit has recognized that "even if direct participation is not necessary to satisfy this element . . . surely it is sufficient." Estate of Booker, 745 F.3d at 435 (internal quotations omitted).

Lieutenant Burton directly participated in the group effort to take Mr. Finlinson into custody. He acted in concert with the other officers during the brief attempt to execute his initial

plan and during the ensuing chase. He also directed the other officers throughout the incident. His direct participation satisfies the first element.

The third element requires that the supervisor acted with the requisite state of mind, which is the same "of the subordinates to commit the underlying constitutional violation." Id. The "mens rea" for a Fourth Amendment claim is objective reasonableness, "which the Tenth Circuit has interpreted as requiring a showing of reckless—as opposed to merely negligent— conduct." Wilson v. Montano, No. 11-cv-658 KG/SCY, 2014 WL 12647931, at *4 (D.N.M. Nov. 4, 2014) (citing Durastanti, 607 F.3d at 667–668). A reasonable jury could find that Lieutenant Burton's plan to commit Mr. Finlinson was reckless and caused the shooting, which would satisfy the state of mind requirement.

For these reasons, Mr. Finlinson has presented facts showing supervisory liability on the part of Lieutenant Burton, but not Sheriff Dekker.

**MILLARD COUNTY**

In addition to his claims against the Officer Defendants, Mr. Finlinson alleges that Millard County is liable under § 1983 for failing to train its officers on how to interact with mentally ill people. He also contends that Sheriff Dekker was a Millard County policymaker who made or ratified decisions that violated his constitutional rights. Millard County seeks summary judgment on all of Mr. Finlinson's claims against it.

Under § 1983, a municipality cannot be held strictly or vicariously liable for the actions of its employees; liability can only attach when "action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978) (emphasis added). Accordingly, "[t]o succeed in a § 1983 claim

against a municipality, a plaintiff must show two elements: '(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation.'" Cordova, 569 F.3d at 1193 (quoting Walker v. City of Orem, 451 F.3d 1139, 1152 (10th Cir.2006)).

A municipal policy or custom may be shown in a number of ways, three of which Mr. Finlinson alleges here: (1) the failure to adequately train employees, where failure results from "deliberate indifference" to the injuries that may be caused; (2) the decision of a final policymaker; and (3) ratification by a final policymaker of a subordinate's decision and the basis for it. Bryson v. City of Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010).

## I.      Standard of Review

While Mr. Finlinson's claims of county liability require evidence of an underlying constitutional violation, the court reviews the County's motion under the familiar summary judgment standard, without qualified immunity burden shifting.

## II.     Failure to Train

A county may be liable under § 1983 if its "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989). A failure-to-train claim against a county or municipality has five elements:

> (1) the training was in fact inadequate; (2) the officers exceeded constitutional limitations on the use of force; (3) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (4) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and (5) there is

> a direct causal link between the constitutional deprivation and the inadequate training.

Cacioppo v. Town of Vail, Colo., 528 Fed. Appx. 929, 933 (10th Cir. 2013) (quoting Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir. 2003)) (alteration marks omitted)

Noting that Mr. Finlinson has established constitutional violations at this phase of the case, the court will address the remaining elements.

## A.     Inadequacy

To show inadequacy, a "plaintiff must identify a specific deficiency that was obvious and closely related to his injury." Porro, 624 F.3d at 1329 (internal quotation omitted). A plaintiff cannot simply say that "an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." City of Canton, 489 U.S. at 390 (emphasis added). Moreover, liability will not attach to a county simply because its officers are poorly trained—for example, because the program was poorly administered, or the officer made mistakes. Id.

Mr. Finlinson has presented sufficient evidence to show that Millard County's mental health training program was inadequate. Deputy Blad and Sargent Clark both testified in depositions that they only received formal training on how to interact with the mentally ill while at police academy. Lieutenant Burton testified that he only received two such trainings by the Millard County Sheriff's Office, in 2005. Deputy Thomas testified that he never received such trainings.

Millard County records confirm a paucity of mental health training. Records from 2006 to 2017 show that all of the officers in the Sheriff's Office completed a total of 827 hours of training during this time. Yet they show just one potentially relevant training, in 2009—a single

class entitled "Effectively Managing Mentally Ill Person" that accounts for just two training hours. (Millard Cnty. Training Record at 3, Ex. H to Millard Cnty.'s Mot. Summ. J., ECF No 101-10) And none of the officers had completed the Crisis Intervention Team Program—best practices training that the Utah legislature and governor encouraged by concurrent resolution in 2011 "in response to the need for Utah's law enforcement officers to better understand and deal with issues arising from persons with mental illness." (Crisis Intervention Team Program Resolution at 3, Ex. CC to Pl.'s Mem. Opp'n to Millard Cnty.'s Mot. Summ. J., ECF No 122-29). Mr. Finlinson has met his burden of showing inadequacy.

### B.      Usual and Recurring Situation

The record clearly indicates that encounters with mentally ill people—including civil commitments—are a usual and recurring situation for the Millard County Sheriff's Office. Sheriff Dekker, Lieutenant Burton, and Deputy Blad all testified in their depositions that, as police officers, they regularly interacted with mentally ill individuals. (See Pl.'s Mem. Opp'n to Millard Cnty.'s Mot. Summ. J. at 59 (Pl.'s ¶ 42).) Millard County policy accounts for the fact that "deputies may be directed to take a person into custody for delivery to a mental health facility." (Millard Cnty. Policy, Ex. I to Adams Mot. Summ. J., ECF No. 101-11.) Indeed, Sheriff Dekker testified that the blue slip process was a "regular occurrence." (Dep. of Robert Dekker at 38:1, Ex. G to Adams Mot. Summ. J., ECF No. 101-9.) Mr. Finlinson has presented evidence showing that the officers' use of force arose in a usual and recurring situation.

### C.      Deliberate Indifference

"Deliberate indifference" is an objective standard that "may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially

certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998). Most commonly, notice "can be established by proving the existence of a pattern of tortious conduct." Id. But, "[i]n a 'narrow range of circumstances,'" it also "may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." Id. at 1307–08 (quoting Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 409 (1997) and City of Canton, 489 U.S. at 390 & n.10).

The Tenth Circuit in Allen v. Muskogee, Okla., 119 F.3d 837 (10th Cir. 1997), recognized that inadequate mental health training may amount to deliberate indifference even absent a pattern of tortious conduct. The plaintiff in that case presented evidence that police officers' inadequate training caused them to rush an armed, suicidal man sitting in his car. Id. at 842, 845. According to the plaintiff's expert, "the officers' actions were reckless and totally contrary to proper police practices for dealing with armed mentally ill or emotionally upset persons." Id. at 842. Rushing the man was "likely to provoke a violent response, resulting in a high risk of death to officers, the armed person, and other civilians." Id.

Mr. Finlinson has not alleged a pattern of tortious conduct. And while he alleges that his March 13, 2014 arrest gave Millard County actual notice that its mental health training was substantially certain to cause a constitutional violation, the arrest happened as a result of a valid

traffic stop, not a mental health intervention. This was not itself sufficient to put Millard County on actual notice that its mental health training was inadequate.[16]

But as in <u>Allen</u>, Mr. Finlinson has presented sufficient evidence to show that Millard County had constructive notice that its mental health training was inadequate. As discussed in connection with the usual and recurring element, the Millard County Sheriff's Office was regularly called on to effect civil commitments of mentally-ill people. Yet the officers had little, if any, mental health training. Millard County's inadequate mental health training in light of these "recurring situations" falls "within the 'narrow range of circumstances' recognized by <u>Canton</u>," and "could justify a finding that the [County's] failure to properly train its officers reflected deliberate indifference to the obvious consequence of the [County's] choice." <u>Id.</u> at 845.

**D.    Causation**

Lastly, Mr. Finlinson has sufficiently shown causation. As discussed, a county's failure to train must directly cause the constitutional violation. <u>Monell</u>, 436 U.S. at 691. Millard County argues that its use of force against Mr. Finlinson "was caused by the attacks by Plaintiff, despite the best efforts of the officers to avoid a violent confrontation." (Millard Cnty. Mot. Summ. J. at 46, ECF No. 105.)

But the facts, viewed in the light most favorable to Mr. Finlinson, suggest otherwise. The officers attempted to civilly commit Mr. Finlinson through use of a traffic stop without personally assessing his mental state beforehand. And when their plan immediately devolved

---

[16] The officers' knowledge of the March 13, 2014 incident does, however, factor into the totality of the circumstances the court uses to determine the reasonableness of the later use of force.

into a chase—a reasonably foreseeable consequence, given the circumstances—they pursued Mr. Finlinson as if he were an ordinary criminal suspect, without regard to his mental condition and the effect such an action could have upon him. They tried to trap Mr. Finlinson and, when that failed, they shot him. "The likelihood of a violent response to this type of police action" supports the inference that the County's deliberate indifference to the training of its officers "led directly to the very consequence that was so predictable." Allen, 119 F.3d at 845. Mr. Finlinson has met his burden on summary judgment of inferring liability on the part of Millard County for inadequate mental health training.

### III.    Policymaker Decision

Mr. Finlinson has not shown that Sheriff Dekker, Millard County's relevant policymaker, made a decision that amounts to a policy.

A county may be liable under § 1983 for a single decision made by a relevant policymaker—an official "responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 483 (1986). A "decision" in this context means "a deliberate choice to follow a course of action . . . made from among various alternatives." Id. at 483.

The parties agree that Sheriff Dekker is the relevant policymaker here. But Mr. Finlinson has not set forth any facts showing that Sheriff Dekker made a decision about how to commit Mr. Finlinson. While the record shows that Lieutenant Burton may have discussed his plan with Sheriff Dekker, this fact alone does not evidence a deliberate decision. Indeed, Lieutenant Burton did not recall sharing the details of his plan with the Sheriff at that time. Sheriff Dekker, for his part, did not recall hearing of any details. And when Sheriff Dekker called Lieutenant

Dekker later in the day for an update, when the officers has begun watching Mr. Finlinson's house, Sheriff Dekker suggested a different course of action—that the officers try to take Mr. Finlinson into custody before he got into his truck.

Because Mr. Finlinson has failed to present any facts showing that Sheriff Dekker made a deliberate decision about how to commit Mr. Finlinson, his assertion of liability under this theory fails as a matter of law.

## IV.    Ratification

Mr. Finlinson also alleges liability for Millard County on the theory that Sheriff Dekker ratified the other officers' conduct. This theory fails is also unsupported by the record.

Liability can attach to a county if a policymaker ratifies a subordinate's conduct:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with <u>their</u> policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final [policy]."

<u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988).

But "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification." <u>Feliciano v. City of Cleveland</u>, 988 F.2d 649, 656 (6th Cir. 1993) (citing <u>Praprotnik</u>, 485 U.S. at 127). Otherwise, a county or municipality "would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from <u>respondeat superior</u> liability." <u>Id.</u>; <u>see also</u> <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1348 (9th Cir. 1992) ("To hold cities liable under section 1983 whenever policymakers fail to overrule the

unconstitutional discretionary acts of subordinates would simply smuggle <u>respondeat superior</u> liability into section 1983 law . . . .").

Mr. Finlinson has not presented any evidence showing that Sheriff Dekker approved Lieutenant Burton's plan and the basis for it. At most, Mr. Finlinson has created an inference of "mere acquiescence" to Lieutenant Burton's conduct, which does not support county liability under a ratification theory.

**UTAH COUNTY**

The court now turns to Utah County's separate motion for summary judgment on Mr. Finlinson's claims against it, which arise from his pre-trial detention at the Utah County Jail (the Jail). Mr. Finlinson asserts that Utah County is liable under two separate legal theories: municipal liability under § 1983, and violation of the "unnecessary rigor" clause of the Utah State Constitution.

**I.      Municipal Liability Under § 1983**

Mr. Finlinson contends that Utah County violated his right as a pretrial detainee through a policy of prematurely punishing pretrial detainees for their "perceived—but unadjudicated—violence against law enforcement officers." (Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J. at 27.) In his case, he says Utah County meted out punishment through final policy decisions of Lieutenant Killian and Monte Memmott, which resulted in the following actions:

> (1) keeping him in administrative segregation during his entire eight-month detention, (2) keeping him on "suicide watch" for over six weeks without justification, and (3) refusing to permit access to prescribed anti-psychotic medication.

(<u>Id.</u>)

Municipal liability under § 1983 is very limited. As discussed above, even assuming an employee has violated a person's constitutional rights, the municipality is only liable if "a policy or custom … actually caused that violation." Cordova, 569 F.3d at 1194. In other words, Mr. Finlinson must prove that a Utah County policy or custom "was the moving force behind the constitutional deprivation." Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998).

### A.    Constitutional Violation

The purpose of holding a pretrial detainee is to assure his presence at trial. Bell v. Wolfish, 441 U.S. 520, 523 (1979). Because the detainee has not been convicted of a crime, "the Fourteenth Amendment's guarantee of due process prohibits any punishment of those awaiting trial." Blackmon v. Sutton, 734 F.3d 1237, 1241 (10th Cir. 2013) (emphasis in original). See also Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977) ("The State does not acquire the power to punish … until after it has secured a formal adjudication of guilt in accordance with due process of law.").

Mr. Finlinson may prove that Lieutenant Killian and Monte Memmott (the Licensed Clinical Mental Health Counselor from Wasatch Mental Health) punished him for actions that led to his charges in one of two ways. He may show that an "expressed intent to punish on the part of the detention facility officials' exists…." Blackmon, 734 F.3d at 1242 (emphasis added) (quoting Bell, 441 U.S. at 538). Alternatively, he may create an inference of punishment "by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective." Id.

> Absent a showing of an expressed intent to punish on the part of the detention officials, that determination generally will turn on "whether an alternative purpose

> to which [the restriction] may rationally be connected is assignable for it, and <u>whether it appears excessive in relation to the alternative purpose assigned [to it]</u>."

<u>Id.</u> (emphasis added) (quoting <u>Kennedy v. Mendoza-Martinez</u>, 372 U.S. 144, 168–69 (1963)). Mr. Finlinson argues that his evidence establishes both express and inferred intent to punish him for alleged violence against police officers.

First he points to Lieutenant Killian's deposition testimony in which she states that detainees are almost always placed in administrative segregation if the charges include aggravated violence against a police officer, whereas segregation of a detainee charged with aggravated violence against a civilian is determined on a case-by-case basis. To Mr. Finlinson, Lieutenant Killian's statements are express evidence of a custom to automatically segregate detainees who have been accused of actions similar to Mr. Finlinson's. But her statements alone are too vague to establish express intent to punish. They do, however, add to Mr. Finlinson's circumstantial evidence that Jail decision makers kept him on suicide watch and, overall, in administrative segregation to punish him for his actions.

### 1. Eight Months of Administrative Segregation

The Jail's Administrative Segregation Policy justifies segregation when a prisoner exhibits behavior that is "dangerous, threatening, or otherwise unacceptable" or if he threatens "the safety, security, control, or order" of the Jail. Jail records and Lieutenant Killian's descriptions during her deposition do not indicate that Mr. Finlinson exhibited behavior falling under those categories.

As noted above, Lieutenant Killian acknowledged the Jail's customary segregation of detainees with charges of violence against law enforcement officers. She articulated nothing but

vague concerns about Mr. Finlinson. And the incident reports contain equally vague explanations for segregation (for example, multiple entries simply state that Mr. Finlinson was segregated "Per Lt. Killian"). Moreover, day-to-day observations recorded in the incident reports and chart notes do not document any concrete reason for Mr. Finlinson's continued segregation, much less evidence that he exhibited "dangerous, threatening, or otherwise unacceptable" behavior or otherwise threatened "the safety, security, control, or order" of the Jail. One could reasonably infer that Mr. Finlinson's status (i.e., his charges of violence against law enforcement officers), rather than any behavior at the Jail (which appeared to be quite passive), was Lieutenant Killian's justification for limiting his housing privileges.[17] In other words, he was negatively treated (i.e., punished) for eight months based on a set of unproved charges.

### 2.     Six Weeks of Suicide Watch

Other than the initial lack of communication from Mr. Finlinson (which was the intake deputy's stated reason for placing him on suicide watch and Mr. Memmott's initial reason for keeping him on suicide watch), the record is devoid of evidence that Mr. Finlinson behaved in a manner consistent with Mr. Memmott's concern about self-harm (which of course is the main criterion for keeping a detainee on suicide watch). Certainly there is no evidence to support Mr. Memmott's vague "precaution" that somehow justified suicide watch for six weeks.[18]

---

[17] Even if medical concerns about treatment of his gunshot wounds played into the segregation, those concerns were resolved long before he was released.

[18] As noted earlier, a detainee on suicide watch must wear a "suicide smock" (a dress-like garment made of heavy, quilted material fastened with Velcro at the shoulders) and may not wear glasses, even if he is legally blind without them.

According to the record, any threat of self-harm had dissipated long before Mr. Memmott took Mr. Finlinson off suicide watch.  Mr. Finlinson communicated with Mr. Memmott three days into the suicide watch (Mr. Memmott's first evaluation of Mr. Finlinson).  After that visit, Mr. Memmott reported that Mr. Finlinson was "resistive to questioning and gave short, irritated, sarcastic responses." (Aug. 11, 2014 Chart Note.)  But Mr. Finlinson denied "suicidal ideation." (Id.)  Despite Mr. Finlinson's denial, Mr. Memmott kept him on suicide watch "due to his charges and being his frist [sic] time in jail" and for "observation."  (Id. (emphasis added).)

At Mr. Memmott's second evaluation of Mr. Finlinson (sixteen days into the suicide watch), Mr. Finlinson once again spoke with Mr. Memmott, who observed that Mr. Finlinson "was not agitated or depressed" and did "not appear to be a danger to himself and [did] not appear to be suicidal."  (Aug. 20, 2014 Chart Note.)  This time the stated reason for keeping Mr. Finlinson on suicide watch was "lack of interaction with staff."  (Id.)

Throughout Mr. Finlinson's stay on suicide watch, he reportedly told staff and Mr. Memmott that he did not have suicidal ideations.  In fact, on the day he was placed on suicide watch, he said so to the Intake Deputy.  He did not show signs of intent to harm himself, and did not threaten to commit suicide, much less do anything to harm himself.  And Mr. Memmott admitted that he ultimately kept Mr. Finlinson on suicide watch as a "precaution." [19]  In short, the

_____

[19] It appears that Mr. Memmott's "precaution" was not rationally related to statistics on inmate suicides at the Jail.  According to a presentation given by Mr. Memmott, of the nine suicides that took place at Utah County Jail from 2004 to 2013, seven occurred within the first week of incarceration. (Memmott Presentation, Ex. E to Pl.'s Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-5.)  Of the other two, one occurred while the inmate was away from the jail using a GPS tracking device, and the other occurred the day after the inmate was caught walking away from work release. (Id.)

record does not corroborate Mr. Memmott's stated reasons for keeping Mr. Finlinson on suicide watch for any length of time, much less for six weeks.

A reasonable jury could infer that Mr. Memmott's decision to keep Mr. Finlinson on suicide watch for six weeks had no reasonable relationship to any legitimate governmental objective. This inference is bolstered by Mr. Finlinson's expert report criticizing the Jail's decision (i.e., Mr. Memmott's decision) to keep Mr. Finlinson on suicide watch for such a long time.

In his report, Dr. Alex del Carmen, a criminologist, wrote:

> My opinion in this case relates to the fact that Mr. George J. Finlinson was placed on suicide watch at the [Utah] County Jail on 8/8/14 until 9/23/14. It is clear from the records reviewed, that Mr. Finlinson was placed on suicide watch at the jail for a total of 46 days while not exhibiting behavior that would be deemed suicidal or one that would require immediate isolation from the rest of the jail population.

(Expert Rep. of Alex del Carmen, Ph.D., dated Apr. 20, 2018, at 4, Ex. F to Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J., ECF No. 125-6.) He then opined, "as a criminologist with over 20 years of academic and field experience and having written a book on corrections" that:

> Mr. Finlinson's placement in suicide watch for 46 days falls outside the correctional industry's norms and best practices. Further, his placement in suicide watch for 46 days without the critical intervention and on-going "genuine clinical assessment" of Mr. Finlinson, constitutes behavior by those that administer the jail [that] not only deviates from the norm but … is also not consistent with best practices.

(Id.)

If a restriction "appears excessive in relation to the alternative purpose assigned" to it, as it does here, an inference of punishment may be drawn. Bell, 441 U.S. at 538 (quoting Kennedy,

372 U.S. at 168–69). See also Blackmon, 734 F.3d at 1242 (intent to punish may be established "by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective.").

### 3.    Haphazard Administration of Medication

When Mr. Finlinson was booked into the Jail, the intake deputy referred to the prescription for Haldol. That prescription required regular shots of Haldol, which were to be given every four weeks. There is no evidence that the Jail did not have access to Haldol. Yet the Jail, through Mr. Memmott and Travis Hunter (the APRN with Wasatch), did not follow the prescription. The record suggests that the prescription was ignored, even after Mr. Finlinson said he received shots in the hospital and wondered if he needed more, and despite his family's requests that he be given Haldol.

The Jail and Mr. Memmott were aware that Mr. Finlinson was being held pending a court's determination that he was competent to go to trial. Haldol was a means for regaining competency if given as prescribed. Without regular doses of Haldol, he did not have a reasonable chance to obtain that court order, as the December 2014 state court competency decision shows. That court held that Mr. Finlinson was not competent because he was not receiving medication on a regular basis. (See Dec. 5, 2014 Order Committing Def. to Utah State Hospital.)

Mr. Finlinson argues that Mr. Memmott's and Mr. Hunter's poor management of Mr. Finlinson's medication is evidence of an intent to punish him for the behavior that led to his charges. The court agrees that the haphazard administration of Mr. Finlinson's medication demonstrates a deliberate indifference to his needs and, by inference, an intent to punish.

Given all of the above evidence, the court finds that a reasonable jury could infer an intent to punish Mr. Finlinson. The next question is whether a Utah County policy was the "moving force" behind the constitutional violation.

**B.      Municipal Policy**

A plaintiff may establish a policy by showing a formal regulation or policy statement. But he may also show that a policy existed through a custom or usage having the force of law, the decisions of employees with final policymaking authority, the final policymaker's ratification of the employee's action, or the entity's deliberately indifferent failure to adequately train or supervise employees. Bryson, 627 F.3d at 788.

Here, Mr. Finlinson does not point to a formal policy statement. Instead he focuses on the decisions of employees with final policymaking authority. "[I]f an official, who possesses final policymaking authority in a certain area, makes a decision—even if it is specific to a particular situation—that decision constitutes municipal policy for § 1983 purposes." Randle v. City of Aurora, 69 F.3d 441, 447 (10th Cir. 1995) (citing Pembaur, 475 U.S. at 48). In other words, Utah County is liable if Mr. Finlinson was injured by decisions of those at the county "'whose edicts or acts may fairly be said to represent official policy.'" Praprotnik, 485 U.S. at 121–22 (quoting Monell, 436 U.S. at 694).

Sheriff Tracy is the final policymaker for Utah County when it comes to overall operation of the Jail. As such, Utah County asserts it has no liability because Sheriff Tracy had no notice or information about Mr. Finlinson's situation and made no decision affecting Mr. Finlinson. But Mr. Finlinson does not rely on the Sheriff's overall authority to support his case. He points out that a policy decision is not limited to decisions by an official policymaker such as Sheriff

Tracy if the policymaker delegates some of his authority. Specifically, Mr. Finlinson contends that the Sheriff delegated his authority to segregate prisoners to Lieutenant Killian and to Mr. Memmott as a representative of third-party contractor Wasatch Mental Health and that the delegation gave Lieutenant Killian and Mr. Memmott final policymaking authority over matters concerning prisoner segregation.

Courts have established "three elements that help determine whether an individual is a 'final policymaker': (1) whether the official is meaningfully constrained 'by policies not of that official's own making;' (2) whether the official's decision[s] are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." Randle, 69 F.3d at 448 (citing Praprotnik, 485 U.S. at 127 and Ware v. Unified School Dist., 902 F.2d 815, 818 (10th Cir. 1990)).

### 1.      Lieutenant Killian

Considering the language of the Administrative Segregation Policy, and looking at the three factors identified in Praprotnik, the court concludes that Lieutenant Killian made final policy decisions about segregation of prisoners. A reasonable jury could find that her decision to segregate Mr. Finlinson constituted a policy to punish detainees charged with violence against law enforcement officers.

Lieutenant Killian was not constrained in her housing classification duties by any jail policy. Sheriff Tracy delegated final segregation decisions to the housing sergeant, in this case Lieutenant Killian, through the Administrative Segregation Policy.

The Policy defines "Administrative Segregation" as "a non-punitive inmate management tool used to neutralize a specific, documented risk. It can be indefinite in duration. However,

63

once the need for the restriction is resolved, the inmate should be returned to a general population housing area." (Administrative Segregation Policy § 321.00.) This "[t]emporary restriction of privileges and/or services may be imposed when necessary to gain immediate control over an inmate's dangerous, threatening, or otherwise unacceptable behavior," and the reasons for imposing the restriction must "always be documented in the inmate file." (Id. § 321.02.) An initial decision to segregate a detainee must be "reviewed as soon as possible by a supervisor to determine whether the restrictions should be continued." (Id. § 321.03.) Lieutenant Killian, as the supervisor, made that final classification decision.

The Policy gave Lieutenant Killian carte blanche to make segregation decisions (in this case, segregation of pretrial detainees charged with violence against policy officers) because her decision was not subject to meaningful review. Darin Durfey, the Jail Commander, stated that a prisoner may not file a grievance with the Sheriff to complain about his housing assignment. At most, a prisoner may appeal his classification to "classification staff." (Decl. of Darin Durfey ¶ 16, ECF No. 95.) Lieutenant Killian was the "classification staff."

The final Praprotnik factor—whether the decision was within the realm of the officer's grant of authority—is clearly satisfied here. Lieutenant Killian, as housing sergeant, made the decision to house Mr. Finlinson in administrative segregation for the length of his stay.

The court finds that, for purposes of the detainee segregation, Lieutenant Killian was the final policymaker for that part of Jail management.

Mr. Finlinson has presented evidence that Lieutenant Killian used her delegated authority to designate Mr. Finlinson as a high risk prisoner and segregate him. She then affirmed, and re-affirmed, that decision for eight months based on Mr. Finlinson's charges. This, as the court has

found, gives rise to an inference of punishment. Accordingly, her decision, which was consistent with the Jail's (her) practice to segregate detainees accused of violence against policy officers, constituted a policy to punish and, based on the record before the court, was the moving force behind the violation of Mr. Finlinson's due process rights.

### 2. Mr. Memmott

The Sheriff delegated final policymaking authority to Wasatch Mental Health (i.e., Mr. Memmott) for treatment of prisoners' mental health, including suicide watch designations, through the County's contract with Wasatch Mental Health. The County defers all treatment decisions, including the decision to remove a prisoner from suicide watch, to Wasatch.

Mr. Memmott's decision to keep Mr. Finlinson on suicide watch for six weeks was a final, unreviewable decision that created and implemented a policy to punish pretrial detainees for alleged violence against law enforcement officers.

The fact that Wasatch Mental Health is a private contractor for services does not shield the County from liability for Mr. Memmott's (Wasatch Mental Health's) decisions. Wasatch, through its contract with the County, was the sole provider of mental health services. It assumed the Jail's duties to provide mental health care to the inmates. That makes it a state actor. See, e.g., West v. Atkins, 487 U.S. 42, 49–50 (1988) (holding that contract physician was state actor whose actions were "fairly attributable" to the state); Carl v. Muskegon Cnty., 763 F.3d 592, 596 (6th Cir. 2014) (holding that psychiatrist, who was an independent contractor providing jail mental health services to pretrial detainees at a county jail, was a state actor for purposes of § 1983 claim because he performed a public function traditionally reserved to the state); Crooks v. Nix, 872 F.2d 800, 804 (8th Cir. 1989) ("[T]he mere contracting [for medical] services with an

independent contractor does not immunize the State from liability for damages in failing to provide a prisoner with the opportunity for such treatment."); <u>Ancata v. Prison Health Servs., Inc.</u>, 769 F.2d 700, 703 (11th Cir. 1985) ("Although [private contractor] Prison Health Services and its employees are not strictly speaking public employees, state action is clearly present. Where a function is traditionally the exclusive prerogative of the state (or here, county) is performed by a private entity, state action is present."). The reasoning behind such findings is in part based on the need to prevent a state from escaping its "§ 1983 liability by contracting out or delegating its obligations to provide medical care to inmates." <u>Carl</u>, 763 F.3d at 596.

> [F]inding no state action [by a third-party contractor] would incentivize the state to contract out, piece by piece, features of its prison healthcare system. … Sanctioning a state's delegation of duties in this manner is incompatible with [<u>West v. Atkins</u>, 487 U.S. 42 (1988)], which admonishes that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody."

<u>Id.</u> at 597–98.

Taking that rule one step further, the court finds that because Wasatch (through Mr. Memmott) makes final unreviewable decisions about suicide watch, which is a subpart of segregation, it (Mr. Memmott) is a final policymaker for the County. This is not a conclusion without precedent.

In <u>Ancata v. Prison Health Services</u>, the Eleventh Circuit held that an independent contractor providing medical treatment to county prisoners was a final policymaker whose decisions exposed the county to municipal liability under § 1983. "[I]f [independent contractor] Prison Health Services and/or its employees have the responsibility to make final decisions" in a particular area of what would otherwise fall within the prison's obligations, "their acts, policies and customs become official policy." 769 F.2d at 705 n.9. In other words, if the county allowed

its private contractor to establish that policy or custom, the county could be liable for constitutional deprivations caused by that policy. "Such liability would not be based upon notions of respondeat superior. The liability would [in essence] be a result of the county's own policy." Id. at 706.

The District of New Mexico faced a similar issue in Herrera v. County of Santa Fe, 213 F. Supp. 2d 1288 (D.N.M. 2002). The Herrera court held that the third-party contractor hired by the county to run the county detention center (Cornell Corrections, Inc.) was a state actor for purposes of § 1983. But then the court addressed the issue of whether Santa Fe County, which contracted with Cornell to manage the detention center, would be subject to § 1983 municipal liability based on the unconstitutional actions of Cornell's employees. Citing to Ancata, the court held that the county would. The county had "contracted with Cornell to perform a significant public function." Id. at 1292. By doing so, "the county delegated final policy-making authority for the operation of the detention center to Cornell. Any custom or policy established by Cornell with respect to such operation, therefore, constitutes a custom or policy of the county for purposes of § 1983 liability." Id.

Here, Utah County contracted with Wasatch Mental Health. That was a delegation of final policymaking authority governing mental health treatment, including suicide watch determinations. Acting on behalf of that final policymaking authority, and carrying out suicide watch policies, Mr. Memmott's actions expose the County to § 1983 liability for violation of Mr. Finlinson's due process rights.

Based on the evidence provided by Mr. Finlinson, a jury could reasonably infer that Mr. Memmott kept Mr. Finlinson on suicide watch for an inordinately long time without justification

on the record, all for the purposes of punishment.  And because Mr. Memmott was the final

policymaker in that realm of the County's duties, the County may be liable to Mr. Finlinson.

Accordingly, it may not escape liability for Mr. Memmott's suicide watch decisions that violated

Mr. Finlinson's due process rights.

In conclusion, the court holds that Sheriff Tracy delegated the relevant policymaking

authority to Lieutenant Killian and Monte Memmott (i.e., Wasatch Mental Health) and that their

decisions about Mr. Finlinson's housing constituted policies of Utah County for purposes of

§ 1983.  The court also finds, in viewing the evidence in a light most favorable to Mr. Finlinson,

that Mr. Finlinson has presented evidence that those policies were the "moving force" behind the

violation of Mr. Finlinson's due process rights.  Accordingly, Utah County is not entitled to

summary judgment on Mr. Finlinson's § 1983 municipal liability claim.

## II.    "Unnecessary Rigor" Clause of the Utah State Constitution

Mr. Finlinson asserts that Utah County violated his right under the Utah Constitution,

which provides that "Persons arrested or imprisoned shall not be treated with unnecessary rigor."

Utah Const. art. I, § 9.  "[T]he unnecessary rigor provision has no federal counterpart."  Dexter

v. Bosko, 184 P.3d 592, 595 (Utah 2008).

A plaintiff who seeks monetary damages under the Utah Constitution, as Mr. Finlinson

does, must establish four elements.

To begin, Mr. Finlinson must establish that the constitutional clause is self-executing.

Jensen ex rel. Jensen v. Cunningham, 250 P.3d 465, 481 (Utah 2011).  That is easily done, for

the Utah Supreme Court has held as a matter of law that "Article I, section 9 is a self-executing

provision."  Bott v. DeLand, 922 P.2d 732, 737 (Utah 1996), abrogated in part on unrelated

grounds by <u>Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.</u>, 16 P.3d 533 (Utah 2000).

Then he must show that: (1) he <u>"suffered a 'flagrant' violation" of his constitutional right to be free from unnecessary rigor</u>; (2) the existing remedies do not redress his injury; and (3) "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his … injuries." <u>Spackman</u>, 16 P.3d at 538–39 (emphasis added). Utah County contends that Mr. Finlinson has not established that he suffered a flagrant violation of his rights, much less that he can hold Utah County (through the Sheriff as an official representative of the County) liable for any such violation.

For the reasons set forth below, the court cannot decide the question because the parties' briefing of the issues is incomplete. The court's concern lies with the nature of Mr. Finlinson's injury and the municipal status of Utah County.

### A.      Mr. Finlinson's Injury

Under Utah law addressing the "unnecessary rigor" clause, it appears that the distinction between a physical injury and a non-physical injury is material.

In <u>Dexter v. Bosko</u>, the Utah Supreme Court analyzed an "unnecessary rigor" claim brought by a prisoner who was injured in a car accident during a prison transport after the guards did not fasten his seat belt (he was shackled and was unable to do it himself). In that case, the Court articulated a two-part test for determining whether a flagrant violation of the "unnecessary rigor" clause has occurred: "[f]irst, the nature of the act presents an obvious and known serious risk of harm to the arrested or imprisoned person; and second, knowing of that risk, the official

acts without other reasonable justification." <u>Id.</u> at 598. That test was articulated in an opinion written by Justice Wilkins, with whom Justice Durrant concurred.

But Justice Nehring wrote a concurring opinion, in which Chief Justice Durham and Justice Parrish joined. There, he questioned the scope of that two-part test. Recognizing the test was formulated in a case where the plaintiff's claim arose from a physical injury, he wrote, "This two-part test presumes that the official's act resulted in physical injury to the person in custody" and, he reasoned, could "be read to imply that money damages are recoverable only by victims of unnecessary rigor who sustain <u>demonstrable physical injury</u>." <u>Id.</u> at 599 (emphasis added). But he cautioned that "[n]o such inference should be extracted from the adoption of our flagrant violation test." <u>Id.</u> No further explanation was given. Then he wrote, "We leave for another day the question of whether money damages may be recovered by persons in custody who may have been subjected to unnecessary rigor but who have <u>not</u> sustained physical injuries." <u>Id.</u> (emphasis added).

Nothing in the record suggests that Mr. Finlinson suffered a conventional physical harm like the one at issue in <u>Dexter</u>. In some sense the conditions at Utah County Jail affected Mr. Finlinson physically (e.g., he lost a significant amount of weight, suffered from reduced vision for six weeks, and was erratically medicated). But Mr. Finlinson does not discuss whether his alleged injury falls within the definition of injury contemplated by the Utah Supreme Court. In fact, neither party raises the issue.

Moreover, if Mr. Finlinson seeks recovery based on a non-physical injury, the question becomes whether the Utah Supreme Court would allow such a claim. The answer is not clear; to

date, the Utah Supreme Court has not decided the question raised in Justice Nehring's concurrence in <u>Dexter</u>.[20]

B.       **Utah County's Municipal Status**

Mr. Finlinson asks the court to find Utah County vicariously liable under the "unnecessary rigor" clause for the constitutional torts of its employees and agents.  Utah County argues that <u>Monell</u> and its progeny foreclose liability.  <u>Monell</u> clearly holds that an entity may not be vicariously liable under § 1983 for the acts of its employees.  <u>Id.</u> at 691.  But that rule does not govern in the state constitutional context.  Federal law does not set the standard for interpreting the Utah Constitution's "unnecessary rigor" clause, which has no federal counterpart.  <u>Jensen ex rel. Jensen</u>, 250 P.3d at 477–78 ("[T]he standards for determining whether a plaintiff is entitled to damages for a state constitutional violation differ from the standards for assessing claims under the federal constitution.").  To the extent Utah County contends that federal case law governing vicarious or supervisor liability dictates a dismissal of Mr. Finlinson's state law claim, its analysis is misplaced.

That leaves the court with state law.[21]  Although Mr. Finlinson urges the court to find vicarious liability under Utah common law (<u>see</u> Pl.'s Mem. Opp'n to Utah Cnty.'s Mot. Summ. J. at 43), he provides no analysis of Utah vicarious liability law, much less a discussion of whether it applies in the constitutional context to cases where the municipal employer, rather

---

[20] The only post-<u>Dexter</u> decision addressing the "flagrant violation" element is <u>Jensen v. Cunningham</u>, 250 P.3d 465 (Utah 2011).  But it did not deal with an "unnecessary rigor" claim.  <u>Jensen</u> analyzed a request for monetary damages for violation of other clauses of the Utah Constitution (for example, the state constitutional right of parents to direct the medical care of their child).  <u>See id.</u> at 477–78.

[21] Regardless of whether § 1983 case law provides guidance, the court must begin with Utah law.

than the municipal employee, has been sued by a prisoner. And Utah County does not address state law either.

At this point, without adequate briefing from either party, the court will not decide the merits of Utah County's motion challenging Mr. Finlinson's state law claim. Accordingly, the court denies that portion of the motion for summary judgment without prejudice.

## ORDER

For the foregoing reasons, the court orders as follows:

1. Defendant Utah County's Motion for Summary Judgment (ECF No. 93) is DENIED for the following reasons:

    a. A genuinely disputed material fact exists as to whether Utah County is liable under § 1983 for subjecting Mr. Finlinson to punishment based on a policy of punishing detainees for unadjudicated charges of violence against police officers; and

    b. Given the unaddressed issues arising out of Mr. Finlinson's claim that Utah County violated his rights under the Utah State Constitution's "unnecessary rigor" clause, the court denies that part of the motion without prejudice.

2. Defendant Ian Adams' Motion for Summary Judgment (ECF No. 102), in which the individual Millard County officers join, is GRANTED in part and DENIED in part for the following reasons:

    a. A genuinely disputed material fact exists as to whether Mr. Finlinson's truck was clearly disabled (and Mr. Finlinson thus no longer posed an immediate threat) when Agent Adams and Deputy Thomas shot Mr. Finlinson. Accordingly, the

court denies Agent Adams' and Deputy Thomas' claims of qualified immunity for the shooting; and

    b.  The undisputed facts show that the other Officer Defendants—Deputy Blad, Deputy Mitchell, Lieutenant Burton, and Sheriff Dekker—did not participate in the shooting <u>after</u> Mr. Finlinson's truck may have become clearly disabled, and did not have a realistic opportunity to intervene to prevent Agent Adams and Deputy Thomas from continuing to shoot. Accordingly, the court grants their claims of qualified immunity for the shooting.

3.  The Millard County Defendants' Motion for Summary Judgment (ECF No. 105) is GRANTED in part and DENIED in part for the following reasons:

    a.  The undisputed facts show that Sheriff Dekker did not set the events leading to the constitutional violations in motion, and so is not subject to supervisory liability;

    b.  The undisputed facts show that Sheriff Dekker did not make a decision that amounted to a policy, or that Sheriff Dekker ratified the decision of his subordinates, so Millard County is not subject to municipal liability for Sheriff Dekker's actions;

    c.  Genuinely disputed material facts exists as to whether the tasing was objectively reasonable, and which officers participated in or could have intervened to prevent the tasing, so the Officer Defendants' claims of qualified immunity for the tasing are denied;

d. Genuinely disputed material facts exist as to whether the group effort preceding the shooting and tasing—the initial plan to take Mr. Finlinson into custody and subsequent chase—were objectively reasonable and caused the use of force, so the Officer Defendants' claims of qualified immunity for the preceding events are denied;

e. Genuinely disputed material facts exist as to whether Lieutenant Burton may also be liable under § 1983 as a supervisor for the preceding group effort; and

f. Genuinely disputed material facts exists as to whether Millard County may be liable under § 1983 for failing to adequately train its officers on how to interact with mentally ill individuals.

SO ORDERED this 29th day of October, 2018.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge